No. 58,502

Loretta L. Tetuan, *Appellee,* v. A.H. Robins Company, *Appellant.*

(738 P.2d 1210)

442

Opinion filed June 12, 1987.

*Ronald D. Heck*, of Fisher, Heck & Cavanaugh, of Topeka, argued the cause, and *Cynthia J. Schriock*, of the same firm, was with him on the briefs for appellant.

*Bradley Post*, of Post, Syrios & Bradshaw, of Wichita, argued the cause, and *Arden Bradshaw*, of the same firm, *Robert E. Keeshan*, of Hamilton, Peterson, Tipton & Keeshan, of Topeka, and *Gene E. Schroer* and *Frank Rice*, of Schroer & Rice, P.A., of Topeka, were with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Plaintiff Loretta L. Tetuan filed the present civil action against defendant A.H. Robins Co., Inc., on January 29, 1982. The plaintiff's suit concerned personal injuries allegedly resulting from her use of an intrauterine contraceptive device known as the "Dalkon Shield," and alleged negligence, civil conspiracy, strict liability in tort, breach of warranty of merchantability, breach of express warranty, fraud, and gross and wanton negligence. On May 3, 1985, a jury returned a verdict in the plaintiff's favor for $1.7 million in compensatory damages and $7.5 million in punitive damages. Defendant Robins appeals.

The factual background relating to the plaintiff can be summarized as follows. Loretta Tetuan was born on February 11, 1952. She married Michael Tetuan with whom she had attended school. Plaintiff testified there were no difficulties in the marriage prior to her health problems. The Tetuans had two children: Michael, d.o.b. 12/25/69, and Christina, d.o.b. 7/31/71. Plaintiff did not finish high school and worked in the Ramada

Inn laundry department in Topeka, Kansas. She had never had any serious illness other than appendicitis.

Because Christina was born with Down's syndrome, Michael and Loretta decided not to have any more children for awhile, although they did plan to have more children eventually. Plaintiff's sister suggested that she try an intrauterine device (IUD). Plaintiff brought up the subject of an IUD with Dr. Robert Pfuetze on September 14, 1971.

On the same day, Dr. Pfuetze inserted plaintiff with a Dalkon Shield but did not inform her of the brand of the IUD. Dr. Pfuetze had been detailed by Robins representatives on the Dalkon Shield. Dr. Pfuetze did not tell her of any possible danger from infection and said only that her periods would be a little heavier.

Other than the heavier menstrual periods, plaintiff initially suffered no ill effects from the Dalkon Shield. She resumed work at a new job at Josten's Yearbook Company.

In 1974, Mr. Tetuan joined the United States Army and was stationed in Fort Carson, Colorado. Plaintiff accompanied her husband to Colorado. Because her menstrual flow increased, she went to the post clinic. She was told by an Army nurse that she should have her IUD removed to reduce the heavier flow. She was not told of any dangers from the Dalkon Shield or of the possibility of infection. Her periods returned to normal after the first visit. When Mr. Tetuan was discharged, the couple returned to Topeka.

In 1978, she went to Dr. Pfuetze for a Pap smear. She had not had any physical problems prior to this time. She inquired about having the IUD removed. According to plaintiff, Dr. Pfuetze told her, "You've worn it this long, I don't think you'll have any problem with it."

On September 21, 1979, she went to another physician, Dr. Darrell Weber, after experiencing fever and severe pain in the pelvic area. She had missed a week or two of work because of the pain. Dr. Weber told her she had a pelvic infection and gave her some antibiotics. Dr. Weber did not mention her IUD as a possible source of the infection. Dr. Weber testified that he had received no warnings from Robins regarding the dangers of the Dalkon Shield.

Because the antibiotics were ineffective in relieving the pain,

she was hospitalized, given additional antibiotics, and then released. In March 1980, Dr. Weber removed the Dalkon Shield. No one had yet indicated to her that the Dalkon Shield IUD might be dangerous.

Because the pain still did not subside, in May 1980 she saw Dr. Lucien Pyle, who referred her to Dr. Charles Joss. In order to remove all the diseased tissue, on June 25, 1980, Dr. Joss performed a "total abdominal hysterectomy with bilateral salpingo oopher"—the complete removal of plaintiff's uterus, Fallopian tubes, and ovaries.

After the operation, the Tetuans' marriage disintegrated and they filed for divorce in March 1981. Plaintiff now works at the American Bindery Company where she makes $4.15 per hour. She testified the operation made her feel less of a woman. Dr. Joss testified that "many women who have lost their pelvic structures have a deep feeling that they've lost their femininity and desirability to their husbands and become depressed and mentally sick this way." Otherwise, her *physical* prognosis was generally good. Because of the loss of her ovaries, plaintiff will have to take synthetic hormones for the rest of her life. Testimony at trial indicated that women taking these hormones over a long period of time can experience dangerous side effects which, though not common, include

"increased risk of developing cancer of the lining of the womb, endometrial cancer. They're at increased risk of other cancers like breast cancers, they're at increased risk of liver disorders, of gall bladder disease, of abnormal blood clotting with thrombosis and embolisms, some of which are pretty frightening conditions, like stroke, coronary disease, embolism to the vessels of the eye and so forth, very serious kinds of problems can occur."

Of course, plaintiff will not have to worry about endometrial cancer (cancer of the uterus). She no longer has a uterus.

Loretta Tetuan sued defendants Robins and Dr. Weber. The jury apportioned fault as follows: Plaintiff: 16%; Robins: 84%; Dr. Weber: 0%. The jury found for the plaintiff on the fraud count.

In order to understand the issues raised by this appeal, it is necessary to also summarize the history of the Dalkon Shield.

The Dalkon Shield is a white piece of plastic less than two centimeters in diameter. Roughly oval in shape, it contains four

phalanges on either side which enable it to remain secure in the uterus and gives the shield a crab-like appearance. Attached to the shield is a black string 8-9 centimeters in length. As with all IUDs, no one knows exactly why the Dalkon Shield inhibits conception.

The Dalkon Shield IUD was originally developed by Irwin S. Lerner and Dr. Hugh Davis. The rights to the device were held by the Dalkon Corporation. The Dalkon Corporation was made up of Lerner, Davis, Dr. Thad J. Earl, and Robert E. Cohn. The Dalkon Corporation began manufacturing Dalkon Shields in late 1968.

On February 1, 1970, Dr. Davis published a study in the American Journal of Obstetrics and Gynecology entitled, *The Shield Intrauterine Device: A Superior Modern Contraceptive*. This article would soon become the core of Robins' Dalkon Shield promotional campaigns. In the article, Davis related his study of 640 Dalkon Shield insertions, which he claimed established that the Shield had a 1.1% pregnancy rate per year on the life table method.

Later investigations and studies would raise serious questions about the original Davis study. Biostatistician Dr. Thomas D. Downs, in testimony, characterized the Davis study at trial as being of "very poor quality." The Davis study did not identify the time frame in which the data was collected, the age structure of the subject population, or the method by which the population was selected. No information was given in the study on the length of time the women participated in the study. Downs testified that the Davis article "reads like an advertisement instead of a scientific piece of work." Moreover, the Davis article improperly claimed superiority to the pregnancy rate for other IUDs, even though the data collected in the article dealt only with the Dalkon Shield and used pregnancy rate figures from other sources for other IUDs. No control group was used by Davis in the 1970 article and Davis neglected to mention in his article the substantial financial interest he had in the Dalkon Shield.

The 1.1% pregnancy rate asserted by Davis in his 1970 article aroused the interest of Robins. Prior to Robins' purchase of the Dalkon Shield rights, it sought to find out more about Davis'

study. On June 9, 1970, Dr. Fred A. Clark, an employee of Robins, filed a memorandum on his visit to Baltimore to meet with Davis. Like the original 1970 Davis study, the information contained in the Clark memo did not provide sufficient information to establish a scientifically accurate pregnancy rate for the Dalkon Shield. However, the *minimum* possible pregnancy rate for the data in the Clark memorandum was 5.3%. In other words, prior to its purchase of the Dalkon Shield, Robins had information which indicated that the Dalkon Shield's rate of pregnancy was *nearly five times worse* than Davis' purported 1.1% rate, at a minimum.

The Clark memo reported, "Davis stated that the company which takes the Dalkon Shield must move fast and distribute much merchandise and really make an inroad in 'the next 8 months.' My feeling was that others may be working on similar improvements for IUDs." Robins decided to move fast. On June 12, 1970, A.H. Robins Co., Inc., purchased the rights to the Dalkon Shield. Under the terms of the agreement, the Dalkon Corporation transferred its patents for the Shield to Robins in exchange for outright cash payments, royalties from the continued sale of Dalkon Shields, and employment of Lerner and Earl by Robins as consultants. Robins began to prepare for distribution of the Shield in 1971. The Shield was to be sold for $4.35. In late 1970, the total costs for labor, overhead, materials, and freight amounted to only $.30 for each Dalkon Shield.

While Robins' main competition, Ortho's Lippes Loop IUD, was already widely marketed, the Dalkon Shield had not been produced yet in significant quantities. Moreover, Ortho had four years' prior testing and experience with its IUD. The Dalkon Shield had no pre-marketing testing. A June 8, 1970, internal Robins memo recognized that: "The device has not been subjected to any formal stability testing."

In November 1970, Robins recognized in an internal memo the need for some form of study of the Dalkon Shield. After outlining the subjects to be studied in future clinical studies, the memo stated: "The need for long-term studies stems (1) from the dearth of publishable data on the Dalkon Shield for *marketing support* and (2) from the anticipated need for information available for presentation at the time of implementation of *expected*

*medical device legislation."* (Emphasis added.) Prominent by its absence from this list was the need to ensure product safety. At the time Robins began to market the Dalkon Shield, there were no government *requirements* for pre-market testing for IUDs, but *recommendations* existed that all products be found to be effective and safe, and the 1969 World Health Organization Report recommended a two-year testing program prior to marketing.

In a 1970 memo marked "PERSONAL & CONFIDENTIAL" to W.L. Zimmer, president of Robins, one of Robins' vice-presidents expressed concern over the new product line:

"I worry that our line is limited, to say the least. Our competitors are generally able to offer several means of contraception, including that most widely-accepted sold and used, the O.C. pill. This could permit others to compete on the I.U.D. level on a low price basis, while they make their profits on the other more widely accepted and sold products."

He expressed concern that Robins had

"no present or past R&D effort on contraception and contraceptive methods. . . ."

"I worry about the fact that we have no market knowledge or experience in our company and we are prepared to learn-on-the-job. Meanwhile our competitors have at least a certain amount of know-how and experiences available to them today."

Robins was not only marketing an IUD without significant research experience, it had also instituted several "minor" changes in the size and shape of the Dalkon Shield which had been produced by the Dalkon Corporation. The internal Robins report announcing the design changes concluded: "Incidentally, we will not 'announce' the fact that these minor design changes have been made."

At the time Robins began to produce the Dalkon Shield, it had no evidence of the *safety* of the device; the only information it had on the *efficacy* of the device was the questionable Davis article, which was for a different design of the Shield. Another Robins memo discussed the Shield in December 1970: "Bob does not regard the DALKON SHIELD as an 'established' product. Perhaps in view of the design changes it is 'less established' or more vulnerable than it was." The lack of knowledge about the Dalkon Shield continued after Robins began

distribution of the Shield: "At present [June 10, 1971] we have no 'tangible' evidence, i.e. statistics, of the performance of the current production model of the Dalkon Shield."

Accompanied by an extensive promotional campaign, Robins began to market the Shield nationally in January 1971. The core of Robins' promotion for the Dalkon Shield was that its product was "safe and superior" to other forms of birth control. Robins obtained hundreds of thousands of reprints of Davis' 1970 article and gave them to its detailmen to give to physicians. The reprint given to physicians, however, did not include the label of "Current Investigation" which had originally appeared on the Davis article. Dr. Emanuel Friedman, an expert witness for plaintiff, testified that "Current Investigation" would indicate a preliminary report, something not yet established as scientifically valid.

Product cards prepared in September 1970 to be given by Robins detailmen to physicians lauded the overall superiority of the Shield's pregnancy rate to the pill's and other IUDs', and claimed it was safe and produced no side effects on the body. Other cards prepared in November 1971 also stressed the 1.1% rate.

Robins also prepared, in September 1970, Patient Information Sheets entitled, "Dalkon Shield: Answers to your patients' questions." The answers included:

"Are the IUDs safe?
"Many leading authorities believe they are the safest method of effective contraception available today. Unlike the Pill, they do not produce generalized side effects, such as headaches, blood clots, depression, breast tenderness, hair loss, weight gain, decreased sexual desire, etc.
"Is the Shield as effective as the Pill in preventing pregnancies?
"The pregnancy rates with the modern pills and the modern IUD are similar. The Shield prevents 99% of pregnancies, as do most oral contraceptives."

Although earlier Robins Dalkon Shield literature recommended removal of the Shield within two years, this recommendation was eliminated by November 1971. Literature provided by Robins in 1971 also stated: "The Shield is made of a plastic material which is neither dissolved nor 'used up' by the body tissues. It will provide protection for a period of years. Some women have used the same I.U.D. for five years or longer." The literature did not note that the string attached to the Dalkon

Shield was made of nylon which does disintegrate within the body.

However, Robins' promotion of the Dalkon Shield was not limited to professionals. Even though the Dalkon Shield was an "ethical product," which means it could be dispensed only by licensed physicians, Robins apparently sought to create a market among consumers directly. A Robins memo dated October 1, 1971, stated that top priority had been given to a special promotion of the Dalkon Shield in nonmedical and trade publications. The public relations firm of Wilcox & Williams was to be hired for this purpose.

Publications subject to the campaign included newspapers, Family Circle Magazine, Mademoiselle, Midwest Magazine, Ladies' Home Journal, Time, Glamour, Parade, and Cosmopolitan. The intent of this "press coverage" may be found in the paper submitted by Wilcox & Williams to Robins on November 30, 1971, entitled "A Communications Program for A.H. Robins Company, Inc." It outlined a program to obtain favorable reaction among the general public. Favorable reaction was defined in terms of increased sales of the Shield. A progress report on the promotional campaign defined the project as one "to obtain *consumer* coverage for the Dalkon Shield." (Emphasis added.)

The promotional campaign directed at doctors and consumers was apparently very effective. By September 1972, 80 percent of doctors inserting IUDs were inserting Dalkon Shields. By February 13, 1973, over two million Dalkon Shields had been sold.

Prior to its purchase of the Dalkon Shield, Robins had only the questionable 1970 Davis article to substantiate the effectiveness of the Dalkon Shield. However, the 1.1% rate was the basis for all of Robins' promotion for the Dalkon Shield because it allowed Robins to claim superiority over other IUDs and equality to oral contraceptives. Evidence at trial indicated that Robins knew the Dalkon Shield was not as successful as advertised in preventing pregnancies.

In December 1972, Dr. T. Primrose of the Royal Victoria Hospital in Montreal wrote to Dr. Ellen J. Preston, of Robins:

"(B) My colleagues in other provinces have informed me that the pregnancy failure rate of the shield in their hands is up to 7-8 per 100 woman years which they find unacceptable."

Also in December 1972, Robins received the following letter from Major Russel J. Thomsen, M.D., of the United States Army Hospital at Fort Polk, Louisiana, which stated, in part:

"Other than pointing out the inadequacies of this advertisement I will add a few observations about clinical useage [*sic*] of the Dalkon Shield. Like most obstetricians-gynecologists, I was impressed with the logic of the early claims for the Shield. I used it widely. But I (about two years later) no longer use it. My experience and that of many of my colleagues suggests that the actual long term (2 to 4 year) pregnancy rate with the Dalkon Shield is actually about 10 per cent when term pregnancies, miscarriages, and ectopic pregnancies are considered with their respective major morbidities. And the complications of menorrhagia, metrorrhagia, uterine cramping, and pelvic inflammatory disease also seem high.

. . . .

"I am recommending that you seriously evaluate again the Dalkon Shield and its place in the clinical practice of birth control measures.

"I am also suggesting that you correct your advertising and issue appropriate cautionary statements to physicians. In fact, I am suggesting that you withdraw the Dalkon Shield from the market until its safety can be established."

Dr. Preston replied to a 1973 inquiry to have Robins consider funding a possible study on the Dalkon Shield. "As I indicated to you during our telephone conversation, I am not very amenable at this point to expending a great deal of money or personnel time to analyze Dalkon Shield data which is anticipated to be unfavorable."

In June 1972, Robins began to receive reports of women experiencing septic abortions while wearing the Dalkon Shield. A septic abortion occurs when a woman, after becoming pregnant, experiences an infection of the reproductive system which causes the spontaneous abortion of the pregnancy. Dr. Thad J. Earl, one of the developers of the Dalkon Shield, also reported in June 1972:

"The next situation I have found is with women becoming pregnant and if the Shield is left in place the women abort at 3½ to 5 months and become septic. I am advising physicians that the device should be removed as soon as a diagnosis of pregnancy is made. Numerous physicians have noted this. In my six pregnancies, I removed one and she carried full term, the rest all aborted and became septic. I therefore feel it is hazardous to leave the device in and I advised that it be removed. I realize that this is a small statistic but I feel we should correlate this data with other investigators across the country, because most men are experiencing the same problem."

Other reports of severe infections continued in 1972 and in

1973. In April 1973, Dr. Anne Board, a Robins doctor, sent a memorandum to Dr. Ellen J. Preston, which stated:

"As well as I can determine, there is a feeling or rumor (based upon the fact that several individuals have each experienced one case) that if a patient becomes pregnant while having a Dalkon Shield in place, therapeutic abortion should be carried out post-haste. The reason for this is that patients with Dalkon Shields are more likely to experience septic abortion than either (1) patients using other IUDs or (2) patients without IUDs who happen to experience spontaneous abortions."

Dr. Preston responded:

"I do not know what relationship, if any, exists between the incidence of sepsis in patients pregnant with the Dalkon Shield and the incidence of PID in the nonpregnant patient with a Dalkon Shield. It has been suggested by some, particularly from the West Coast, that there is an increased incidence of PID associated with the Dalkon Shield over that seen with other IUDs. I see no reason that this should be so, and none of my requests to physicians holding this view have resulted in any sort of documentation supporting this allegation."

Information letters collected by Robins in its Spontaneous Septic Abortion File indicated that the total number of septic abortions associated with other IUDs was 39. The total number of Dalkon Shield septic abortions was 250.

In 1974, because of growing reports about septic abortion and Robins' discovery that Dr. C.D. Christian of the University of Arizona was preparing an article on the Dalkon Shield and septic abortions, Robins invited numerous physicians to a Robins-sponsored conference on septic abortion and IUDs in February 1974. (Dr. Christian's article, published in June 1974, reported on seven cases of septic abortions and five further cases of maternal deaths.) At the February 1974 conference, Robins made no mention of the information it had concerning the wicking phenomenon of the Dalkon Shield tail string, no mention that Robins was "desperately" looking for a replacement string, or Dr. Earl's 1972 report of septic abortions. (In August 1974, an unsigned Robins report states: "Five cases were reported from Thad Earl in June, 1972. These cases were inadvertently overlooked until the other day. No information at all is available on them.").

The consensus at the February 1974 conference was strong enough that, on May 8, 1974, Robins issued its first "Dear Doctor" letter. The letter recommended that physicians remove

Dalkon Shields from women who became pregnant. Robins issued a press release stating that "insufficient information is available to establish any cause and effect relationship between the Dalkon Shield and septic spontaneous abortion."

On June 26, 1974, the FDA requested Robins suspend distribution of the Dalkon Shield. Robins announced the suspension to its distributors: "This is <u>NOT A RECALL,</u> but a suspension of sale until further notice, which is expected during the latter part of August." An accompanying press release stated, "neither A.H. Robins nor the FDA has any reason at this time to believe that women now using the Dalkon Shield successfully should have the device removed." In August 1974, Robins Public Affairs Vice-President Richard Velz reported in a memo: "You will note that the August 23 WASHINGTON POST article mentions the dangerous word 'recall.' However, that statement was in error and further coverage corrects that." A Robins "Status Report for Dalkon Shield" stated under the heading "<u>Legal Implications</u>," the statement: "It is the opinion of [Robins attorney Roger L.] Tuttle that if this product is taken off the market it will be a 'confession of liability' and Robins would lose many of the pending lawsuits."

After sales of the product were temporarily suspended by the FDA in June 1974, Robins continued its overseas distribution of Dalkon Shields. A November 1974 Dalkon Shield ad in the Australian and New Zealand Journal of Obstetrics and Gynaecology compared the Shield's effectiveness to other IUDs. Its claim of superiority was based on Davis' 1970 1.1% rate which a Robins memo had characterized as "not valid" in 1973.

In August 1975, Robins announced it was abandoning plans to re-market the Dalkon Shield under new FDA regulations. The company announced that "A.H. Robins remains firm in its belief that the Dalkon Shield, when properly used, is a safe and effective IUD." The same assurance of safety and efficacy was made in Robins' 1975 report to its stockholders.

On September 25, 1980, Robins issued a second "Dear Doctor" letter recommending removal of Dalkon Shields from asymptomatic users:

"The medical literature does not establish a firm relationship between the

duration of use of inert IUDs and an increased risk of pelvic infection generally; but a relationship has been suggested by recent literature, particularly when the causative organism is *Actinomyces israelii*. Cases of pelvic actinomycosis which cannot be explained on the basis of direct extension from the gastrointestinal tract have been observed most commonly among long-term IUD users."

Robins soon received several requests from physicians and women requesting payment for the removal, which Robins refused. Robins' Director of Medical Services, Dr. Fletcher Owen, Jr., responded that the second "Dear Doctor" letter "was not intended to be construed as a 'recall'" of a "defective and potentially life-threatening product."

On October 26, 1984, Robins sent out its final "Dear Doctor" letter, in which Robins recommended removal of any Dalkon Shields remaining in place and offered to pay for removal, noting that "[t]here is substantial medical opinion that the continued use of the Dalkon Shield may pose a serious personal health hazard to users." However, Robins has continued to state that the Dalkon Shield is safe.

Shortly after the final "Dear Doctor" letter, Owen appeared on a National Public Radio program in which he characterized the wicking phenomenon as a "red herring." At trial, Robins' board of directors member and ex-president, W.L. Zimmer, III, testified that the Dalkon Shield was "safe and effective."

The Dalkon Shield, like most IUDs, contains a string which descends from the uterus through the cervix and permits the user to ensure the device is in place. Unlike other IUDs, however, the Dalkon Shield contains a string which is composed of 200 to 400 individual filaments enclosed within a nylon sheath. Other IUDs contain monofilament strings. The Dalkon Shield string sheath does not enclose the ends of the string and the filaments are exposed.

The possibility that an IUD string might "wick", *i.e.*, transport fluid by capillary action, was raised prior to Robins' purchase of the Dalkon Shield. The string selected for the Dalkon Shield was the nylon-encased multifilament string. On June 29, 1970, the Robins product management coordinator reported: "The string or 'tail' situation needs a careful review since the present 'tail' is reported (by Mr. Lerner) to have a 'wicking' tendency."

E. Wayne Crowder was quality control supervisor at Chap

Stick, a subsidiary of Robins. Robins had transferred the responsibility for assembly of the final Dalkon Shield device to Chap Stick to minimize costs. In March 1971, Crowder suggested to Lerner that melting the string ends would be more effective in eliminating moisture and bacteria. Lerner stated he would think about it.

Crowder testified that the multifilament string commonly broke during tying operations and that, in the summer of 1971, Crowder rejected some 10,000-12,000 strings for sheath breakage. The rejection was later overruled by Quality Control at Robins. Crowder testified that string breakage was a continual problem.

Crowder tried a simple experiment in June 1971. He placed one end of a Dalkon Shield string in a beaker of water. Several hours later, he discovered he could squeeze water out of the other end of the string. Crowder reported this to his supervisor, Julian Ross, at Chap Stick and, in July 1971, Crowder met with Ross and Chap Stick president Daniel French and told him about his wicking theory and experiment. Crowder suggested the problem could be solved by heat-sealing the string's ends and demonstrated with a cigarette lighter. French responded that heat-sealing would cost too much and that Robins would not accept any changes in production then. To ensure that Robins was informed of his concerns, Crowder included comments on wicking in his report to French on the problem of string stiffness.

On September 2, 1971, a Robins quality control supervisor wrote to Robins' medical department about concerns he discovered after a visit to the Chap Stick plant, including "[w]icking and bacterial problems associated with a multifilament nylon suture versus a sheathed nylon suture." The same report also stated that a heat sealing solution had been suggested for the string stiffness problem, but concluded: "Flame sealing . . . would create another production problem." The significance of the wicking tendency of the tailstring of an IUD is that it provides an avenue for bacteria to travel from the vagina into the uterus, causing infection.

Beginning in 1972, Robins began a search for a replacement string. Robins tested several different types of string material,

including a more expensive teflon string. However, none of these strings was used outside of experiments.

In 1973, Robins received several reports of PID (pelvic inflammatory disease) associated with the Dalkon Shield. In November of that year, a Robins pharmacist noted:

"Dr. Kitty [Ellen] Preston has received reports of the string breaking and/or having visible weak spots. She has requested that tests be run on the string as well as the shields. Her main interest lies with those strings that were in situ for two years or more."

Robins had also received other reports about the Dalkon Shield string. Dr. Stewart Templeton of the Robins subsidiary in Horsham, England, wrote to Robins to inquire about any possible information on the Dalkon Shield and PID. Dr. Templeton wrote that he had received complaints from an English user of the Dalkon Shield who discovered cases of severe PID among his patients, which he felt was caused by the string acting as a wick along which bacteria traveled from the vagina into the uterine cavity.

Throughout 1974, Robins conducted tests on the wicking nature of the Shield string. In October 1974, a memo by a Robins vice-president commented on the hearings of the FDA committee considering whether to lift or retain the ban on sales of the Dalkon Shield. The memo noted:

"In summary, Dr. Clark stated that our critics are unable to prove that the string is the causative factor in the cases associated with septic spontaneous abortions. On the other hand, we are unable to prove conclusively that it is not the causative factor."

Dr. Templeton telexed Robins in November 1974, raising the same solution Wayne Crowder had suggested in 1971. He asked, "WHY DON'T WE JUST HEAT-SEAL THE DISTAL AND/OR PROXIMAL ENDS OF THE PRESENT STRING[?]" A Robins interoffice memo by Dr. Ellen Preston to Robins' medical department vice-president discussed the suggestion, stating:

"I agree. It is too late to 'heat seal' now. We need to abandon the 'multi-filament' string. Heat sealing would have been a good thing to have done 4 years ago."

In February 1975, Dr. Howard J. Tatum of The Population Council, *et al.*, published their study, "The Dalkon Shield Controversy: Structural and Bacteriological Studies of IUD Tails," in

the Journal of the American Medical Association. The study concluded:

"[T]he appendage of the Dalkon Shield is patent to a liquid medium and can and does function as a wick for the passage of fluid throughout its entire length by capillary action."

Among the witnesses at trial were Dr. Judith Haber, a clinical microbiologist. Working for Biskind Laboratories in Burlingame, California in 1974, Dr. Haber performed experiments requested by Robins. Dr. Haber testified that her experiments, the results of which were sent to Robins, involved examining Dalkon Shield strings removed from human users. All of the strings showed some bacteriological growth; 45% showed significant bacterial growth. Haber also testified that, because of the extremely small size of bacteria, the knots in the Dalkon Shield string did not prevent their passage.

In 1983, Dr. Harvey Bank produced similar results in a study of the Dalkon Shield multifilament string. Bank examined used strings, finding bacteria present in every one. He found that fluid similar in viscosity to body fluids in the vagina could wick through the length of the tail string in about 90 minutes. No fluid motion existed for monofilament strings or for multifilament strings that had been heat sealed. Finally, Bank concluded that live bacteria could ascend and exist in the string.

Bank testified at trial that the experiments were simple and could have been performed by anyone with proper equipment. Also testifying was Dr. Daniel Roberts, who examined Dalkon Shield strings removed from human users. Roberts found that all the nylon sheaths had undergone partial or complete disintegration. The deteriorated state of the nylon sheath provided an additional avenue for bacteria to escape from the string into the uterus. Moreover, while the cervical mucus plug normally prevented bacteria from ascending the external sides of the IUD strings, the nylon sheath of the Dalkon Shield string prevented the bactericidal agents of the mucus plug from killing bacteria within the string.

Expert testimony was also introduced at trial comparing PID rates for the Dalkon Shield and other IUDs. The 1976 Center for Disease Control (CDC) report by Cates, et al., indicated the Dalkon Shield produced a PID risk rate three times higher than other IUDs. The 1983 Lee-Ory study concluded the Dalkon

Shield had a PID risk eight times higher than for women who do not use any IUD. Moreover, where the PID risk for other IUDs declined over time, the Dalkon Shield PID rate increased with time, so that the risk eventually reached 15.6 times the non-user rate.

Although there were several other studies introduced by Robins to establish the lack of any relationship between the Dalkon Shield and PID, there appears to be substantial evidence in the record questioning the quality of these studies, which were funded in part by Robins.

In 1971, Roger Tuttle, a member of Robins' legal department, was placed in charge of Robins' products liability cases. Beginning in 1972, cases involving the Dalkon Shield, including PIDs, began to "trickle" in. However, after the first case to reach trial on the merits, *Deemer v. A.H. Robins Co.*, Case No. C-26420 (Dist. Ct. Sedgwick County, Kan. filed Oct. 1974), Robins President W.L. Zimmer, III, on August 15, 1974, sent the following memo to fifteen Robins officers and employees:

"You are requested to immediately search your pertinent files for <u>any</u> letters, memos or notes on oral or written communications relating in any way to the thread utilized for the tail for the Dalkon Shield and send them to Ken Moore. Of particular interest are any references to 'wicking' of the tail. To the extent that you have had any oral communications with third parties on this subject which are not memorialized in writing, please submit a memo on any such communication to Mr. Moore.
"This project is of utmost importance, and should be completed by Friday, August 16."

Tuttle testified that Robins began a program to destroy documents relating to the wicking phenomenon. The destruction program was ordered on February 2 or 3, 1975. Although Tuttle did not personally observe the destruction of documents, pursuant to orders, he instructed Robins employees to destroy documents and was informed that it had been accomplished. Tuttle was ordered to search for and destroy documents by Robins' chief counsel Forrest, who told Tuttle he had discussed the destruction program with Zimmer. Tuttle testified that hundreds of documents were destroyed in a draft furnace. Tuttle secretly saved copies of some of the documents, but the vast majority of the documents were completely destroyed.

Forrest told Tuttle that he blamed Tuttle for allowing the

Clark memorandum of June 9, 1970, to come to light in the *Deemer* case. Forrest said he did not ever want anything like that to happen again, and the only way to ensure that was if the documents no longer existed.

Additional facts will be set out and discussed as necessary to determine the issues in this appeal.

Robins first contends that "such a large volume of irrelevant, immaterial, and inflammatory evidence" was introduced at trial that "prejudice to Defendant permeated the entire trial." Robins recites a long list of allegedly prejudicial evidence, or statements in closing by plaintiff's counsel upon that evidence, which it terms "error," including the following: 1) Evidence of a different pregnancy rate for the Dalkon Shield than the 1.1% Robins claimed; 2) evidence of perforations of the uterus by the Dalkon Shield; 3) evidence of spontaneous septic abortions associated with the Dalkon Shield; 4) other miscellaneous evidence, including a suit filed by Dr. Earl against Robins; a medical journal dated April 11, 1985; Robins' judgment in an antitrust case; references to suits against Robins; and references to medical studies in 1981 and 1982.

The plaintiff's action was grounded in part upon fraud: Robins' deliberate misrepresentation and concealment of the defectiveness of the Dalkon Shield. In *Minx v. Mitchell*, 42 Kan. 688, 692, 22 Pac. 709 (1889), this court stated: "[W]here fraud is alleged, it is always permissible to prove every act of the party charged, connected in any way with the subject-matter of the fraud." Similarly, in *Culp v. Bloss*, 203 Kan. 714, 718, 457 P.2d 154 (1969), this court held that other actions of the defendant were "relevant and admissible for the purpose of showing defendant's motive and intent to defraud the plaintiffs."

A similar issue was raised in *U.S.D. No. 490 v. Celotex Corp.*, 6 Kan. App. 2d 346, 629 P.2d 196, *rev. denied* 230 Kan. 819 (1981). The plaintiff sued defendant Celotex for fraud in the construction of a defective roof. Celotex argued on appeal that the trial court had erred by allowing the introduction of evidence of other Celotex roof failures around the country. The Court of Appeals rejected that argument:

"The evidence of prior roof failures was not introduced by plaintiff to show that the two-ply roof of the El Dorado High School was defective, nor was it used to

indicate that the causes of the problems on previous roofs were related to the causes of the problems on the El Dorado High School roof. The actual purpose of the introduction of these documents was to prove Celotex's knowledge of the defect that gave rise to the duty to warn. As to USD 490's breach of warranty and fraud theories of recovery, the evidence of prior complaints was also relevant to show Celotex's state of mind insofar as its representation is concerned and to prove Celotex's knowledge of its truth or falsity or its reckless disregard of its truth or falsity." 6 Kan. App. 2d at 359.

Citing this court's holding in *Culp*, the *Celotex* court concluded:

"Although Celotex makes much of the fact in its brief that the roofs and roofing problems in the other cases were dissimilar, all of the complaints introduced were about two-ply roofs. We also note that internal memoranda of Celotex made reference to the fault of the two-ply roof, regardless of how the problems were manifested." 6 Kan. App. 2d at 360.

In this case, the evidence of Robins' knowledge of the higher pregnancy rate, perforations, and septic abortions was directly relevant to show Robins' consistent failure to reveal the true nature of its product, and its continuing failure to warn. The theme of Robins' promotion of the Dalkon Shield was that it was "safe and effective." The great weight of evidence at trial was that it was neither, and that Robins was aware it was not.

"Fraud is normally a secretive act and must be concealed for success," *Chute v. Old American Ins. Co.*, 6 Kan. App. 2d 412, 422, 629 P.2d 734 (1981), and thus "considerable latitude should be granted in the introduction of evidence to prove the fraud." 6 Kan. App. 2d at 422 (citing *Brakefield v. Shelton*, 76 Kan. 451, 453, 92 Pac. 709 [1907]). In the present case, the evidence complained of by Robins, the reports of spontaneous abortions, the reports of perforations, and the reports of a much higher pregnancy rate were all relevant to show Robins' continuing concealment of information from doctors and from women.

In *Craig v. A.H. Robins Co., Inc.*, 790 F.2d 1 (1st Cir. 1986), Robins made the same argument before the First Circuit. Robins attacked the relevancy of evidence relating to the Dalkon Shield's pregnancy rate. The Court of Appeals rejected the argument, stating that evidence of "the frequency of pregnancies experienced by Dalkon Shied users . . . [helps to] form part of a pervasive picture of covering up a defective product and contin-

uing to merchandise it by misrepresenting both its efficacy and its safety." 790 F.2d at 4.

In *Hilliard v. A.H. Robins Co.*, 148 Cal. App. 3d 374, 410-11, 196 Cal. Rptr. 117 (1983), the court rejected a similar argument by Robins, stating:

"The question remains, however, whether evidence of allegedly 'false' or inaccurate pregnancy rates is inadmissible as claimed by defendant Robins. Dr. Dekle, who fitted plaintiff Hilliard with the Robins' IUD, testified he relied, in part, on what he was told by detailmen and what he had seen in Robins' promotional material in using and recommending the Dalkon Shield. He was dubious about the low pregnancy rate claimed for the Dalkon Shield, yet he did not anticipate the rate would exceed two percent based on Robins' promotional efforts and his experience. This evidence was clearly admissible and relevant. If the evidence showed that the rate was substantially higher than the advertised rates in 1972, when Dalkon Shield was placed in plaintiff's uterus, the doctor might not have used that IUD or perhaps any IUD."

In the present case, Dr. Pfuetze also testified that he relied upon Robins to properly test its product.

Neither was Robins successful before the Supreme Court of Colorado. In *Palmer v. A.H. Robins Co., Inc.*, 684 P.2d 187 (Colo. 1984), the plaintiff had experienced a septic abortion rather than a pelvic inflammatory disease. The court held that Robins' Dalkon Shield adverse reaction reports were admissible, even where they involved injuries other than septic abortions:

"The adverse reaction reports constituted legally relevant evidence on the issue of notice to Robins of the potentially dangerous character of the shield. Robins' knowledge of reported adverse consequences from the use of the shield was a significant component of Palmer's claim that, by failing to eliminate these dangers or to give warning of them, Robins prevented her and her physician from making an informed decision on the use of the shield as a contraceptive device. The adverse reaction reports rendered the existence of notice of a dangerous or defective product more probable with the evidence than without it. [Citation omitted.]

"Although the adverse reaction reports included references to untoward consequences other than septic abortions, the nature of these other reported incidents did not impair the legal relevancy of the evidence. These other incidents were probative of notice to Robins that something might well be amiss with its product." 684 P.2d at 199.

Robins complains of plaintiff's counsel's reference in closing argument to Robins' antitrust lawsuit, the *Hartz* settlement (but not, apparently, to the original evidence of the *Hartz* settlement). The financial position of Robins was in issue because of the claim for punitive damages. Robins received $42 million

under the *Hartz* settlement, and it was therefore relevant as to punitive damages.

Robins complains of a "reference to law suits." The complaint is somewhat misleading. The reference by plaintiff's counsel in closing argument did not involve use of the other pending Dalkon Shield cases for any improper purpose. Plaintiff's counsel was stressing Dr. Tatum's credibility by noting that his tests proving the string's wicking action occurred prior to his subsequent testimony in Dalkon Shield litigation. It should be noted that Robins, as well as the plaintiff, consistently attacked the other's compensated witnesses for appearances in prior Dalkon Shield litigation. We find no merit to Robins' challenge to this evidence and conclude the trial court did not err in its rulings on the evidence.

Robins next contends there was no evidence to justify submitting the claim of fraud to the jury. Robins' contention is based on a lack of reliance by the plaintiff or her doctors upon any representations by Robins as to the Dalkon Shield, or if there was reliance, that it was the cause of plaintiff's injuries.

When a verdict is challenged for insufficiency of the evidence or as being contrary to the evidence, it is not the function of this court to weigh the evidence or pass on the credibility of the witnesses. If the evidence with all reasonable inferences to be drawn therefrom, when considered in the light most favorable to the prevailing party, will support the verdict, the verdict will not be disturbed on appeal. *Toumberlin v. Haas,* 236 Kan. 138, 689 P.2d 808 (1984).

The existence of fraud is a question of fact and we are limited to determining whether the verdict is supported by substantial evidence. Keeping in mind that fraud is never presumed and must be proven by clear and convincing evidence, we turn to the record in the instant case.

Plaintiff did not know the IUD she wore was a Dalkon Shield until after her injuries and after it had been removed. When Dr. Pfuetze inserted the Dalkon Shield in 1971, he did not mention what brand it was. Therefore, Robins argues plaintiff did not rely upon any representations by Robins.

Robins further argues that there was no evidence that Dr. Pfuetze relied upon representations that the Dalkon Shield was

safe and effective when he inserted the device in plaintiff in 1971. Robins claims he was aware of potential dangers of IUDs, including specific possible problems with infection. In 1978, Robins argues, Dr. Pfuetze was aware of specific problems of infection in Dalkon Shield users, and he advised plaintiff of this problem and recommended removal. Thus, regardless of Robins' failure to inform Dr. Pfuetze about wicking problems, there was no causative effect on Dr. Pfuetze's decision to insert the Dalkon Shield, since he was already aware of the potential problem that would result from wicking, if it occurred. As to Dr. Weber, Robins argues that, when in 1979 he made the decision not to remove the Dalkon Shield, he had not been "detailed" by anyone from Robins nor relied upon any representations attributed to Robins.

The factual conclusions Robins makes from the evidence are not supported by the record. Dr. Pfuetze testified that he had been detailed by Robins representatives prior to the insertion. He testified that he was aware there was some danger of infection associated with IUDs, but that he did not discover until later the full dangers of infective disease. Dr. Pfuetze testified that he had relied upon Robins for adequate testing of its device prior to marketing. Dr. Pfuetze did not tell plaintiff of any dangers associated with IUDs. If Dr. Pfuetze had been told that the Dalkon Shield string could wick bacteria, he would never have used it. If plaintiff had known of the dangers of the Dalkon Shield, she would never have used it.

In 1978, about a year before plaintiff's symptoms began, she again saw Dr. Pfuetze for a bad cold. Based upon information he had read in medical literature, Dr. Pfuetze recommended removal of the device. However, while he told her that removal might be preferable, he also did not insist on it. Removal would be imperative only if she became pregnant. Dr. Pfuetze told her that, since she had worn the device this long, she should not have any trouble with it.

Plaintiff saw Dr. Weber in 1979 when the infection began. Dr. Weber did not remove the device but treated her with antibiotics. Dr. Weber testified that, if he had received information in 1979 similar to that Robins released in its third "Dear Doctor" letter in 1984, he would have immediately removed the device.

The argument that there was no reliance in this case is simply incredible in light of the evidence. Both the woman using the device and the doctor inserting it testified they would not have used the Dalkon Shield if they had been informed of its true nature. Dr. Weber testified he would have immediately removed the Shield in 1979 rather than first treating plaintiff with antibiotics if he had known of the Shield's dangers.

Dr. Pfuetze's recommendation that removal of the IUD might be preferable was based on his reading of general medical literature, which did not disclose the full dangers of the Dalkon Shield that Robins had concealed. Dr. Pfuetze, in 1978, was only following the limited information that Robins had released in 1974 in its first "Dear Doctor" letter, that the Dalkon Shield should be removed from *pregnant* wearers to prevent septic abortions. Because of Robins' failure to fully inform doctors of the dangers of the Dalkon Shield, Dr. Pfuetze told plaintiff that, since she had worn the device for so long, she should not have any trouble with it.

That Loretta Tetuan did not know the device within her was a Dalkon Shield, and that Robins made no representations directly to her, is irrelevant. IUDs are ethical products—that is, they are available only through licensed medical care providers. In *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, 681 P.2d 1038, *cert. denied* 469 U.S. 965 (1984), we held that the manufacturer of an ethical drug has a duty to warn the medical profession of dangerous side effects of its products of which it knows, has reason to know, or should know, based upon its position as an expert in the field. This duty is a continuing one, and a breach of that duty by the manufacturer will result in the manufacturer being directly liable to the patient. The rationale for adopting such a rule was stated in *Terhune v. A.H. Robins Co.*, 90 Wash. 2d 9, 14-15, 577 P.2d 975 (1978):

"The reasons for this rule should be obvious. Where a product is available only on prescription or through the services of a physician, the physician acts as a 'learned intermediary' between the manufacturer or seller and the patient. It is his duty to inform himself of the qualities and characteristics of those products which he prescribes for or administers to or uses on his patients, and to exercise an independent judgment, taking into account his knowledge of the patient as well as the product. The patient is expected to and, it can be presumed, does place primary reliance upon that judgment. The physician decides what facts

should be told to the patient. Thus, if the product is properly labeled and carries the necessary instructions and warnings to fully apprise the physician of the proper procedures for use and the dangers involved, the manufacturer may reasonably assume that the physician will exercise the informed judgment thereby gained in conjunction with his own independent learning, in the best interest of the patient. It has also been suggested that the rule is made necessary by the fact that it is ordinarily difficult for the manufacturer to communicate directly with the consumer.

"While recognizing the efficacy of this rule as applied to prescription drugs, the plaintiffs question its applicability to devices such as the Dalkon Shield. In advising upon the selection of a contraceptive, they say, the physician is not attempting to cure a malady and does not 'rely upon his many years of education and experience' to select an appropriate medication. We do not see this as a significant distinction. The physician does not confine his practice to the curing of maladies. He is concerned with the total health and physical well-being of his patients and appropriately gives advice upon preventive measures. Certainly the insertion of the Dalkon Shield requires a physician's services, his knowledge and his skill. While the physician does not make the final choice but leaves that to the patient, he advises the patient with respect to the advantages and disadvantages of various choices, as was done in this case, and it is he who supplies and inserts the device.

"The fact that the patient makes the final choice among suggested contraceptives (or decides not to use any at all) does not constitute a distinction which makes the general rule inapplicable. We can readily conceive of situations in which a physician gives the patient a choice of courses to follow. There is, for example, a patient's choice between continuing to endure a physical ailment or submitting to surgery or some other course of treatment; an obese person's choice among diets suggested by the doctor; and a surgery patient's choice of anesthesia where, in the doctor's opinion, a choice is permissible.

"In any such situation which may come to mind, the patient is expected to look to the physician for guidance and not to the manufacturer of the products which he may use or prescribe in the course of treatment."

We apply that same rationale to plaintiff's action for fraud against Robins, and we hold that, where a patient relies on a physician for treatment or advice as to an ethical or prescription device, justifiable reliance by the physician on misrepresentations or concealment by the manufacturer of that device constitutes justifiable reliance by the patient. Loretta Tetuan relied upon Dr. Pfuetze, as her doctor, to insert a safe device. The testimony at trial was that both doctors in general, and Dr. Pfuetze specifically, relied upon manufacturers to test their products and warn of any dangers.

Robins was told by Dr. Davis that it would have to "move fast" if it wanted to successfully enter the IUD market. Robins moved

fast. With one intensive promotional campaign directed at medical professionals, and another designed by a New York public relations firm to plant news stories to attract the interest of the general public, Robins was able to capture a large part of the IUD market. By 1972, 80 percent of doctors prescribing IUDs were prescribing Dalkon Shields. Robins achieved this success by publicizing Dr. Davis' pregnancy rate, which it knew was false and misleading, and by concealing information about the dangers of the Shield.

Finally, even though plaintiff had never received any direct promotions or representations from Robins, as Dr. Pfuetze had, she still had a right to rely upon Robins. In allowing the Dalkon Shield to remain inside her, she relied upon Robins' failing to come forward with the information it possessed. *She relied upon Robins' malicious silence which, at the time of her injuries, had lasted for more than ten years.* Fraud includes "anything calculated to deceive, including all acts, omissions, and concealments involving a breach of legal or equitable duty, trust, or confidence resulting in damage to another." *Goben v. Barry*, 234 Kan. 721, Syl. ¶ 8, 676 P.2d 90 (1984).

" 'While the broad outlines of fraud have been indicated by regarding it as including any cunning, deception, or artifice used, in violation of a legal or equitable duty, to circumvent, cheat, or deceive another, the forms it may assume and the means by which it may be practiced are as multifarious as human ingenuity can devise, and the courts consider it unwise or impossible to formulate an exact, definite, and all inclusive definition thereof.' " *Citizens State Bank v. Gilmore*, 226 Kan. 662, 667, 603 P.2d 605 (1979) (quoting 37 C.J.S., Fraud § 1, p. 204).

Fraud may arise by the concealment of facts which legally or equitably should be revealed, as well as by affirmative misrepresentation. 226 Kan. at 667. The deliberate suppression of a fact that a party has a duty to disclose is fraud. *Jenkins v. McCormick*, 184 Kan. 842, 339 P.2d 8 (1959). The evidence in this case viewed in the light most favorable to the plaintiff is sufficient to support the jury's finding of fraud. We find no merit in Robins' argument.

Next, Robins attacks jury instruction No. 16 on numerous grounds, first claiming that it was "misleading, confusing, and improperly instructed the jury upon the law." Essentially,

Robins' argument is that the instruction omitted essential elements of fraud under Kansas law. Instruction No. 16 reads:

"In connection with the claim of the Plaintiff based on fraud, the jury is instructed as follows:

"Fraud must be proved by clear and convincing evidence. To be clear and convincing, evidence should be 'clear' in the sense that it is certain, plain to the understanding, unambiguous, and 'convincing' in the sense that it is so reasonable and persuasive as to cause you to believe it.

"If the jury finds by clear and convincing evidence that either the labeling or the advertising of the Dalkon Shield IUD was false and that A.H. Robins Company, Inc., either knew that they were false or were recklessly made without knowledge concerning the truth or falsity of the claim made in the labeling or the advertising and you further find by clear and convincing evidence that the false labeling and advertising caused the selection of the Dalkon Shield by the Plaintiff's physician and you further find that the Dalkon Shield caused the injuries complained of by Plaintiff, then you will be justified in basing a verdict in favor of the Plaintiff on the grounds of fraudulent misrepresentation.

"If the jury finds by clear and convincing evidence that the defendant, A.H. Robins Company, Inc., during the time that Plaintiff was using the Dalkon Shield knew that the continued use of the device by women constituted a hazard, you are instructed that they had a duty to timely and effectively make that known in a way reasonably calculated to reach the women users. Warning to the medical community may be adequate unless the jury finds by clear and convincing evidence that such a warning was or would be either insufficient or ineffective. If you find by clear and convincing evidence that the A.H. Robins Company did not give a sufficient and effective warning, as described herein, and you further find that the failure to do so caused the injuries complained of by the Plaintiff, then you would be justified in basing a verdict in favor of the Plaintiff on fraudulent concealment.

"To recover on her claim of fraudulent misrepresentation, Plaintiff must sustain her burden as to each element set forth in this instruction concerning that claim. To recover on her claim of fraudulent concealment, Plaintiff must sustain her burden as to each element set forth in this instruction concerning that claim. Plaintiff need not prove both claims. However, if she fails to sustain her burden on her claim of fraudulent misrepresentation and on her claim of fraudulent concealment, you will be required to decide the claim based upon fraud in favor of the Defendant A.H. Robins Company, and you should so indicate that on the verdict form and proceed to decide the case on the other issues presented in these instructions."

Robins did not object at trial to instruction No. 16 on the grounds now alleged—that the instruction was misleading or confusing, or that it improperly stated the law. The objection made at trial to instruction No. 16 by Robins was that the evidence did not support a finding of reliance, that the physician

inserting the Dalkon Shield should not have been considered Robins' agent, or that no instruction at all should have been given on fraud:

"MR. BUCK: Sixteen, we object to the Court's allowing the theory of fraud in this case, fraudulent misrepresentation and fraudulent concealment. This is not a proper case, as a matter of law, for the type of common law fraud recognized in the Kansas cases. We also—it's also our position that there's not enough evidence as a matter of law to allow this theory to go to the jury; and we also object to the use of the physician as the agent for Robins for purposes of finding reliance. In other words, when you're having common law fraud, there is no direct reliance by the party injured or allegedly injured; therefore, there is no cause of action for fraud on that grounds. Also, there's also no evidence of reliance by plaintiff in this case such as to support an action for fraud."

Robins did not object to the provisions contained in instruction No. 16 as improper statements of the law. K.S.A. 60-251(b) provides:

"No party may assign as error the giving or failure to give an instruction unless he or she objects thereto before the jury retires to consider its verdict *stating distinctly the matter to which he or she objects and the grounds of his or her objection* unless the instruction is clearly erroneous." (Emphasis added.)

Where a party makes only a general objection to an instruction, he or she may not later raise new attacks against a specific provision of the instruction unless it is clearly erroneous. *Thompson v. General Finance Co., Inc.*, 205 Kan. 76, 93, 468 P.2d 269 (1970). Except as to those specific grounds enumerated by Robins at trial, our inquiry is limited to determining if the instruction is clearly erroneous.

Robins properly points out that intent to deceive and reliance are elements of fraud in Kansas. The misrepresentation must be known to be untrue by the person making the statements, or made with reckless disregard for the truth, and reliance thereon must be reasonable and justifiable. *Hutchinson Travel Agency, Inc. v. McGregor*, 10 Kan. App. 2d 461, 701 P.2d 977, *rev. denied* 238 Kan. 877 (1985). The party to whom a misrepresentation is made must also rely upon the misrepresentation to his detriment. *Minnesota Avenue, Inc. v. Automatic Packagers, Inc.*, 211 Kan. 461, 507 P.2d 268 (1973).

As to the intent requirement, the instruction obviously met the requirement of Kansas law. The instruction required the jury to find, by clear and convincing evidence, that Robins' labeling or

advertising was false and that Robins "either knew that they were false or were recklessly made without knowledge concerning the truth or falsity of the claim made in the labeling or the advertising."

The instruction given was prepared by the trial court specifically for this case. Although it does not speak expressly of "reliance," the instruction validly reflects the legal requirements for reliance. The instruction requires the jury to find, by clear and convincing evidence, that Robins' misrepresentations "caused the selection of the Dalkon Shield by the Plaintiff's physician and you further find that the Dalkon Shield caused the injuries complained of by Plaintiff."

The reliance element of misrepresentation serves the function of causation in fact: that the misrepresentation causes someone to act or refrain from acting. Restatement (Second) of Torts § 546, Comment *b* (1976). To satisfy the requirements of misrepresentation, it "must appear that the defendant's tortious conduct has in fact caused the plaintiff damage." 2 Harper, James & Gray, Law of Torts § 7.13 (2d ed. 1986). The false representation must play a "material and substantial part" in causing another to adopt a particular course of conduct. Prosser, Law of Torts § 108, p. 714 (4th ed. 1971). In instruction No. 16, the magic word "reliance" was not used, but the effect was the same: the jury was required to find that Robins' misrepresentations *caused* Dr. Pfuetze to use the Dalkon Shield which, in turn, *caused* Loretta Tetuan's injuries. The jury was thus required to find reliance, although that term was not expressly stated. Indeed, the instruction was more favorable to Robins than the law itself, since it apparently required the jury to find that the misrepresentations were *the* cause of Dr. Pfuetze's use of the Dalkon Shield. Normally, reliance may be found where the misrepresentation "played a substantial part" in the other party's conduct. Restatement (Second) of Torts § 546, Comment *b*.

A different matter is presented by the fact that the instruction does not require a finding of *justifiable* reliance. Ordinarily, the reliance upon another's misrepresentations must be shown to be justifiable in order to recover for fraud. *Hutchinson Travel Agency, Inc. v. McGregor*, 10 Kan. App. 2d 461. However, the instruction is not clearly erroneous. An instruction is clearly

erroneous only if there is a real possibility that the jury would have returned a different verdict. *Powers v. Kansas Power & Light Co.*, 234 Kan. 89, 671 P.2d 491 (1983).

The testimony introduced at trial clearly indicated that physicians in general necessarily rely upon the representation of pharmaceutical manufacturers. Robins provided *utterly* no evidence which would suggest Dr. Pfuetze was not justified in relying on Robins' claims of safety and effectiveness. On the basis of the evidence presented at trial, there was no real possibility a jury could have found Dr. Pfuetze's reliance unjustified.

Robins argues that its fraudulent misrepresentations and concealment were not the "cause" of plaintiff's injuries because, when she saw Dr. Pfuetze again in 1978, and Dr. Weber in 1979, both "had independent knowledge from medical literature concerning the problems possibly associated with IUDs." The record does not support Robins' contention. Dr. Pfuetze testified he knew there was some danger of infection, but that he did *not* know the *full* dangers posed by the Dalkon Shield. Both doctors testified that, if they had been *fully* informed of the Dalkon Shield's dangers, they would have either immediately removed it or would never have inserted it in the first place. Causation plainly exists. The doctors had received some information from medical literature on the dangers of IUDs, but they did not know of the overwhelming amount of information Robins was concealing—or attempting to destroy.

Robins' next argument is rather novel, to say the least. Robins suggests that the instruction was invalid because "[w]hether the *product* caused the injury is *not* a proper inquiry for fraud. The test is whether *any* misrepresentation caused Plaintiff's injury." The case to which Robins cites, *Canterbury Court, Inc. v. Rosenberg*, 224 Kan. 493, 582 P.2d 261 (1978), does not support this novel proposition, nor does any other Kansas case. *Canterbury* provides only that fraud requires reliance, and that the reliance result in injury. The suggestion that a distinction should be made between the "fraud" (Robins' misrepresentations) and the item that is the subject matter of the fraud (the Dalkon Shield), and that only the former can "cause" the injury, is completely without any authority. It is twisted logic at its best. The trial court instructed the jury that it must find that the

misrepresentation caused Dr. Pfuetze to use the Dalkon Shield, and that the Dalkon Shield caused injury to Loretta Tetuan in order to find fraud. There is no error.

Next Robins argues that Dr. Weber had a duty to warn plaintiff. When Dr. Weber treated plaintiff, he was aware of the potential problems associated with IUDs. According to Robins, since the jury found Dr. Weber without fault, he either adequately warned the plaintiff, relieving Robins' duty to warn, or he did not adequately warn, and therefore there is no causation by Robins. Dr. Weber had a duty to warn plaintiff only of those dangers "within his knowledge." Robins' interpretation of the facts finds no support in the record. Dr. Weber was *not* aware of the specific dangers of the Dalkon Shield. The portion of the record to which Robins cites establishes only that Dr. Weber "had read articles on different problems associated with all types of the IUDs [including the] Dalkon Shield." The record does not say whether these were articles critical of the Dalkon Shield, or whether they were the results of some of the "favorable" studies to which Robins solely devoted its funding assistance. In any case, Robins ignores that part of the record which deals with the extent of Dr. Weber's knowledge of the Dalkon Shield dangers. Dr. Weber was not aware of the type of "string" utilized by the Dalkon Shield or that it could wick bacteria through the vagina into the uterus. He further testified that, had he known about these facts, he would have immediately removed the Dalkon Shield from the plaintiff.

The jury could have found Dr. Weber not liable, having fully informed plaintiff of *the dangers known to him*, yet still have found Robins liable for fraudulent misrepresentation and/or concealment.

Instruction No. 9 provides:

"The laws of Kansas provide that an advertisement of a device shall be deemed to be false if it is false or misleading in any particular.

"Advertisement means all representations disseminated in any manner or by any means other than labeling, for the purpose of inducing, or which are likely to induce, directly or indirectly, the purchase of devices.

"In determining whether an advertisement is misleading, you should consider representations made by statement, word, design, device, sound, or in any combinations thereof, but also the extent to which the labeling or advertisement fails to reveal facts material in the light of such representations or materials with

respect to consequences which may result from the use of the article to which the advertisement relates under the conditions of use prescribed in the advertisement thereof or under such conditions of use as are customary or usual.

"The violation of the above law may be considered an act of negligence if the misleading or false statements relate to the cause of an injury."

## Instruction No. 10 provides:

"You are instructed that the laws of the State of Kansas provide that the following acts are unlawful and are prohibited:

"1) Manufacture, sale, or delivery or offering for sale any device that is misbranded;

"2) The misbranding of any device;

"3) The dissemination of any false advertisement.

"A device within the meaning of this act includes any instrument, apparatus, or contrivance intended to affect any function of the human body.

"A device is misbranded if its labeling is false or misleading in any particular; or

"If it is dangerous to health when used as recommended or suggested in its labeling.

"Labeling means all labels and other written, printed, or graphic matter upon an article or its containers or accompanying such article.

"The violation of the above law may be considered an act of negligence if the misleading or false statements relate to the cause of an injury."

Robins attacks these instructions on four grounds: that the Kansas food, drug, and cosmetic act, K.S.A. 65-655 *et seq.*, is preempted by federal law; that the act was not set forth in the pretrial order; that the legislature did not intend the act to apply to this type of case; and that the instructions improperly state the law regarding causation.

Robins cites no authority for its conclusory statement that the Kansas law is "preempted by the Federal Act for the labeling and branding of prescription drugs and devices such as the Dalkon Shield." Nor does Robins provide any argument why preemption exists.

In 1976, Congress added the Medical Device Amendments (21 U.S.C. § 360c *et seq.* [1982]) to the federal Food, Drug, and Cosmetic Act (21 U.S.C. § 301 *et seq.* [1982]). The amendments included new section 21 U.S.C. § 360k (1982), which preempts certain state regulations relating to medical devices. However, the 1976 preemption section applies only to provisions of state laws which create *substantive* requirements for devices. The preemption does not apply where the state statute operates only

to prohibit false labeling or misbranding a device. 21 C.F.R. § 808.1(c) (6)(ii) (1987) provides that the Medical Device Amendments do not "preempt a State or local requirement prohibiting the manufacture of adulterated or misbranded devices." Instructions Nos. 9 and 10 are based upon K.S.A. 65-669 and K.S.A. 65-672, which relate to misbranding and false advertising. Neither the instructions nor the statutory sections on which they are based establish independent substantive labeling requirements, other than the prohibition against false or misleading labeling and advertising. There is no preemption.

However, even assuming the federal law preempts present Kansas law, the relevant period for determining Robins' duty of due care in its labeling and advertising of the Dalkon Shield was the period during which Robins labeled, advertised, and sold the Dalkon Shield: 1970 - 1974. Because the Medical Device Amendments were not passed until 1976, there could be no preemption during the relevant time period.

Robins' second argument is that these statutory standards of care were not identified in the pretrial order. This is not supported by the record. The pretrial order stated:

"PLAINTIFF'S CONTENTIONS

"1. Plaintiff claims the defendant Robins was negligent in one or more of the following respects:

. . . .

"(l) Promoting and selling a misbranded medical device for profit contrary to state and federal law;

"(m) Using false and misleading advertising and labeling to promote Dalkon Shield sales for profit, contrary to law."

During this time, only the Kansas food, drug, and cosmetic law applied to Robins' actions. Robins' argument is without merit—the only possible state laws upon which these plaintiff claims could be based are those used as a basis for instructions Nos. 9 and 10: K.S.A. 65-669 and K.S.A. 65-672. The statutes were adequately identified in the pretrial order.

In any event, the trial court had the power to amend the pretrial order to prevent manifest injustice. K.S.A. 1986 Supp. 60-216; *Black v. Don Schmid Motor, Inc.*, 232 Kan. 458, 657 P.2d 517 (1983). There is no surprise in this case. The plaintiff's requested jury instructions, which expressly cite to the provi-

sions of the state food, drug, and cosmetic law as a statutory basis for Robins' duty of due care, were filed with the court (and hand delivered to counsel for Robins) *44 days prior* to the date the trial court began consideration of requested instructions. There was no surprise. As in *Black*, the appellant knew the other party was relying on this theory and the only possible prejudice was the unfavorable jury verdict.

Robins' third argument appears to be that the Kansas act was designed to protect only the consuming public and that, since the Dalkon Shield was an ethical device available only by prescription, the plaintiff was not within the class protected by the statute. The argument has no merit. We have held that K.S.A. 65-655 *et seq.* is designed to "protect the consuming public from fraud and deception." *Coffee-Rich, Inc. v. Kansas State Board of Health*, 192 Kan. 431, Syl. ¶ 1, 388 P.2d 582 (1964). Plaintiff is a member of the consuming public who has been severely, permanently injured by the fraud, deceit, or negligence of Robins. Robins argues that K.S.A. 65-669(n) removes its statutory duty of care. That statute provides:

"A drug or device shall be deemed to be misbranded:

. . . .

"(n) In the case of any prescription drug distributed or offered for sale in this state, unless the manufacturer, packer, or distributor thereof includes in all advertisements and other descriptive printed matter issued or caused to be issued by the manufacturer, packer, or distributor with respect to that drug a true statement of (1) the established name, as defined in subsection (e)(2) of this section, (2) the formula showing quantitatively each ingredient of such drug to the extent required for labels under 21 U.S.C. 352(e), and (3) such other information in brief summary relating to side effects, contraindications, and effectiveness as shall be required in regulations issued under the federal act."

Even if Robins' argument were true, it relieved it only of the misbranding requirements of K.S.A. 65-669, *not* the false advertising requirements of 65-672. In addition, the exception in K.S.A. 65-669(n) applies, by its express term, only to "prescription *drugs*." (Emphasis added.) Under Kansas law, the Dalkon Shield is a "device"—not a "drug." K.S.A. 65-656 provides statutory definitions of the terms used in the food, drug, and cosmetic act:

"The term 'device' . . . means instruments, apparatus and contrivances, including their components, parts and accessories, intended (1) for use in the

diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; or (2) to affect the structure or any function of the body of man or other animals." K.S.A. 65-656(e).

The definition of the term "drug" expressly "does not include devices or their components, parts or accessories." K.S.A. 65-656(d).

The mislabeling provisions (K.S.A. 65-669) of the act clearly express the intent that no specific exemption exists for prescription devices. K.S.A. 65-669(a) provides: "A drug *or device* shall be deemed misbranded: (a) If its labeling is false or misleading in any particular." (Emphasis added.) The statute directly recognizes that mislabeling may occur for both drugs or devices, but provides a limited exemption in subsection (n) for prescription drugs only. Robins' argument is without merit.

Finally, Robins attacks the instructions because they state that the violation of the state law must "relate to the cause of an injury," rather than stating that the violation must cause the injury.

Instructions must be read as a whole. *Van Hoozer v. Farmers Insurance Exchange,* 219 Kan. 595, 614, 549 P.2d 1354 (1976). Instructions Nos. 9 and 10 are not erroneous when viewed together with the other instructions to the jury. Instructions Nos. 9 and 10, by their express terms, permitted the jury to find only *negligence,* they did not independently permit the jury to find *liability.* Other provisions in the instructions fully satisfy the requirements of causation. Instruction No. 31 expressly requires that, before the jury could find fault for negligence, it must have found that negligence caused the injury complained of. Read in their entirety, the instructions are not erroneous.

We also note that, in *Palmer v. A.H. Robins Co., Inc.,* 684 P.2d 187 (Colo. 1984), Robins made essentially the same arguments regarding the Colorado drug mislabeling statute, which appears to be very similar to the Kansas statute. The Colorado court was no more impressed than are we with Robins' argument.

Next, Robins objects to several of the trial court's instructions relating to the manufacturer's duty to warn. The first, instruction No. 7, provides:

"It is the duty of the manufacturer of a device such as the Dalkon Shield to continuously monitor the use of its product by the consuming public and to

gather information relative to its safety by all reasonable means, including adverse reaction reports, scientific literature and other sources available to it.

"The duty of the manufacturer requires that it give reasonable and adequate warnings concerning any defects or risks associated with the use of the device which come to its knowledge or which, in the exercise of ordinary care, should have come to its knowledge.

"The fact that there is a difference of opinion among authorities as to the existence of or the seriousness of a risk does not by itself entitle the company to ignore or discount the risk if to do so would be unreasonable. The fact that no warning was required by a regulatory agency or was being given by manufacturers of similar products does not exonerate the defendant A.H. Robins Company if the product was defective and they knew or should have known of the defect.

"As previously stated in this instruction, the nature and extent of the warnings or other actions required of the company in the light of the hazards and risks associated with its product must be commensurate with the dangers and risks involved. Whether or not a warning to the medical community alone or other action or warnings were required is for the jury to determine. In this connection, evidence that the company sent out 'Dear Doctor' letters in 1974 and in 1980 may not be considered by the jury as evidence of the company's duty to send out such warnings unless you find that the knowledge and experience existed prior to those dates which would have required the company to issue such warnings earlier. The same is true of the company's 'recall' campaign in the fall of 1984. It may not be considered as evidence of the company's duty to recall the product at any time unless you further find that the literature, the adverse reaction reports and other sources of information available to the company would have required that action be taken earlier.

"The knowledge, actual or constructive, with which the company is charged in this case is that existing between September 14, 1971, and March 17, 1980."

Robins suggests that this instruction created a duty to warn the general public of the dangers of the product, instead of limiting Robins' duty to warn the members of the medical profession only.

It is undisputed that Robins made *no warnings* to *either* doctors *or* women using the Dalkon Shield. If the jury found that a warning was necessary under the circumstances, it could have only found for the plaintiff, since Robins had failed to warn *anyone* of the dangers of PID created by the wicking characteristics of the Dalkon Shield string.

In *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, 409, 681 P.2d 1038 (1984), this court rejected an argument similar to Robins' present argument. *Wooderson* held that a manufacturer of ethical drugs has a duty to continuously monitor its product and to warn the medical profession of any known dan-

gerous side effects. The court did not reach the question of whether there existed a duty to warn persons outside the medical profession because Ortho had warned *neither* the medical profession *nor* the general public. 235 Kan. at 409. Thus, "Ortho's failure to warn the physician is sufficient to sustain the finding of negligence or breach of duty against it in this case." 235 Kan. at 409. Robins' argument fails because it made no warnings to anyone of the dangers of the Dalkon Shield.

Robins next takes exception to instruction No. 8, which provides:

"You are instructed that the manufacturer of an intrauterine contraceptive device to be used in human beings is held to the standard and skill of an expert in that particular field and to an expert's knowledge in the design, testing, manufacture, promotion, and sale. It is also held to the standard and skill of an expert concerning the scientific literature and other available means of communication concerning the device."

Robins argues that the instruction allowed the jury to hold Robins responsible for knowledge acquired after the date of plaintiff's injuries (March 17, 1980). Again, instructions must be read as a whole. *Van Hoozer v. Farmers Insurance Exchange*, 219 Kan. at 614. Instruction No. 7 states: "The knowledge, actual or constructive, with which the company is charged in this case is that existing between September 14, 1971, and March 17, 1980." There is no error.

Instruction No. 13 provides:

"As you have been previously instructed, a product may be defective where not accompanied by adequate warnings concerning risks and dangers associated with its use. Whether or not a warning accompanying a device is adequate depends upon a number of factors. In this case, since the device could only be obtained through a physician, the warning must be of such a nature as to be comprehensible to the average physician using it and to convey a fair indication of the nature and extent of the danger to the mind of the physician using it. As you have been elsewhere instructed with respect to the duty of the manufacturer to take all reasonable steps necessary to warn of dangers and risks which become known to him after the product is placed on the market, the duty to update literature accompanying the device is also a continuing one, and the sources of information to which the company must look in determining whether or not to amend or modify its labeling are the same sources, that is, adverse reaction reports, the scientific literature and any other sources available to it."

Robins'. argument is that the trial court erred by failing to instruct the jury that it was unnecessary for Robins to warn

Loretta Tetuan's physicians if they were already aware of the risks of the Dalkon Shield. Again, the record does not support Robins' contention that either Dr. Pfuetze or Dr. Weber had such knowledge concerning the Dalkon Shield.

The testimony of both physicians was that they were not aware of the full dangers of the Dalkon Shield. They further testified that, if they had been fully informed, they either would have immediately removed the device or would have never inserted it in the first place. Robins' consistent policy of concealing (or attempting to destroy) information on the true dangers of the Shield, of trying to "neutralize" critics of the Shield, and of funding only "favorable" studies ensured that the information available to Dr. Pfuetze and Dr. Weber was inadequate to break the chain of causation between Robins' failure to warn and Loretta Tetuan's injuries. There is no error as to instruction No. 13.

Robins next complains of several instances of alleged misconduct by opposing counsel. In *Kleibrink v. Missouri-Kansas-Texas Railroad Co.*, 224 Kan. 437, 443, 581 P.2d 372 (1978), this court stated:

"Remarks of counsel are reversible error when, because of them, the parties have not had a fair trial. [Citation omitted.] Of course, the trial court is in a better position than an appellate court to determine whether the verdict resulted from asserted misconduct of counsel or from passion and prejudice, and ordinarily its conclusion in the matter will not be disturbed."

An example of misconduct by counsel which prevents the parties from having a fair trial may be found in *Smith v. Blakey, Administrator*, 213 Kan. 91, 515 P.2d 1062 (1973), and the court concluded that the misconduct was not an isolated instance of impropriety:

"It is apparent in this case that plaintiff's counsel's trial strategy was to try defendant's counsel rather than the issues. His efforts were not of an isolated nature but, to the contrary, permeated the whole of the trial from opening statement to final argument." 213 Kan. at 96.

Where the alleged misconduct is isolated and is insufficient to result in substantial prejudice or prevent a fair trial, the trial court's verdict will not be overturned. In *State Farm Fire & Cas. Co. v. Liggett*, 236 Kan. 120, 125, 689 P.2d 1187 (1984), this court found that the remark by counsel

"had no relevance and was improper; but it was clearly a minor incident, insufficient to result in substantial prejudice, and any error was cured by the prompt ruling of the trial court. The case was ably tried, argued and presented to the jury by competent and aggressive counsel. Viewing these remarks from the perspective of the entire six-week trial, they were insignificant and did not prevent the appellant from having a fair trial."

In the present case, Robins has culled from a nine-week trial, with a record of over 6,000 transcript pages, 24 instances of alleged "impropriety." After reviewing these instances of "misconduct," we conclude that the conduct does not approach that which was condemned by this court in *Smith*. A review of the "litany of alleged misconduct" in this case reveals that Robins was not denied a fair trial.

In only two instances was plaintiff's counsel's action in any sense improper or misconduct, as opposed to simply asking questions objectionable on an evidentiary basis. Indeed, in an overwhelming proportion of Robins' "litany," counsel for plaintiff was entirely within his rights, asking questions about or commenting on evidence that had already been independently admitted or would be subsequently admitted.

The first instance was in impeaching Robins' lead witness on the basis of a National Public Radio broadcast by the witness, in which the extent of the Dalkon Shield litigation was revealed, and the second in counsel's comment in closing argument that "thousands" of injuries might have been averted but for Robins' fraudulent concealment. In the former instance, Robins' counsel objected, the objection was sustained, and the trial court carefully instructed the jury to disregard the question. The reference appears from the record to have been entirely inadvertent. The NPR broadcast transcript, from which counsel for plaintiff was reading in order to impeach a witness who had spoken on the broadcast, mentions the extent of the Dalkon Shield litigation. The record does not indicate that counsel was deliberately seeking to introduce invalid evidence.

In the latter instance, while the statement was not inadvertent, it was made in passing during the course of a four-hour oral argument. No objection was made. The trial court instructed the jury that argument by counsel is not evidence, and should be disregarded to the extent it is not supported by the evidence. We

cannot find that these two comments, in the course of a nine-week trial in which an immense amount of information was collected and given to the jury, so prejudiced Robins that it did not receive a fair trial.

In determining whether improper actions by counsel amount to reversible error, Kansas courts have given great weight to the presence or absence of an objection and the curative effect of a well-phrased admonition to the jury. *Masson v. Kansas City Power and Light Co.*, 7 Kan. App. 2d 344, 350, 642 P.2d 113, *rev. denied* 231 Kan. 801 (1982). It is only in the extreme case that a lawyer's misconduct cannot be cured by instructing the jury to disregard it. In *Merando v. A.T.& S.F. Rly. Co.*, 232 Kan. 404, 418, 656 P.2d 154 (1982), we found that allegations of misconduct during a lengthy trial "were cured by prompt rulings of the trial court or they were insufficient to result in substantial prejudice." In *Kelty v. Best Cabs, Inc.*, 206 Kan. 654, 656, 481 P.2d 980 (1971), we held that, where mention of insurance was inadvertent, its admission may be cured by instruction of the jury to disregard. In a products liability action in *Cantrell v. R.D. Werner Co.*, 226 Kan. 681, 602 P.2d 1326 (1979), the defendant drug manufacturer argued on appeal that plaintiff's counsel had intentionally prejudiced the trial, asserting six different areas of alleged misconduct. We reviewed the allegations and found all to be without merit. 226 Kan. at 683. The same conclusion is warranted here. This was a long and difficult trial; the record indicates that the trial court should be commended for its handling of the case.

The jury awarded plaintiff compensatory damages in the amount of $1.7 million, and punitive damages in the amount of $7.5 million. Robins attacks these awards on four grounds: that the compensatory and punitive damage awards are excessive, that the trial court erred by refusing to remit the punitive damage award, that further awards of punitive damages against Robins would be contrary to the public interest, and that the punitive damage award unconstitutionally punishes Robins.

A. Compensatory Damages

Robins bases its argument that the compensatory damages awarded are excessive by comparing the $1.7 million award in the present case to other awards. Robins then concludes without

substantial analysis that the award could be only a product of "the passion and prejudice" of the trial court jury.

Where a charge of excessive verdict is based on passion or prejudice of the jury but is supported solely by the size of the verdict, the trial court will not be reversed for not ordering a new trial, and no remittitur will be awarded unless the amount of the verdict in light of the evidence shocks the conscience of the appellate court. *Cantrell v. R.D. Werner Co.*, 226 Kan. at 686. Where the alleged passion or prejudice of the jury is not shown by definite proof, but depends for support solely on the size of the verdict, the award will be upheld unless it shocks the conscience of the court. *Henderson v. Hassur*, 225 Kan. 678, 594 P.2d 650 (1979). There is no simple, symmetrical pattern or design for determining whether a verdict is sufficient or insufficient, since each case must stand on its own facts. *McGuire v. Sifers*, 235 Kan. 368, 681 P.2d 1025 (1984).

Robins emphasizes that Loretta Tetuan incurred only $6,000 in medical expenses, that she now earns more than she did prior to her injury, and that her second child had Down's syndrome. Prior to her injury, plaintiff earned $3.75 per hour. At the time of trial, she was employed by the American Bindery Company in Topeka, Kansas, and earned $4.15 per hour.

It is true that one of plaintiff's children has Down's syndrome. It is equally true that the other does not. In any case, the issue is whether plaintiff and her husband planned on having additional children; the uncontradicted testimony of plaintiff was that they did. Robins fails to mention other uncontradicted trial testimony. The surgical measures necessary to save plaintiff's life have created permanent psychological scars and directly caused the disintegration of her otherwise successful marriage. For the rest of her life she will have to take powerful, and occasionally dangerous, synthetic hormones, not by choice but due to the acts or failure to act by Robins.

In *Cleveland v. Wong*, 237 Kan. 410, 701 P.2d 1301 (1985), we held that a jury verdict of slightly over $1 million, which included the wife's loss of consortium, was not excessive where the defendant had caused the husband to be impotent and incontinent. In so holding we stated:

"In the case now before us, the injury sustained by the plaintiff is substantial,

severe, and permanent. The causal negligence of the defendant is clearly established. The effect upon the plaintiff and his wife has been and will continue to be severe. The verdict, though substantial, does not shock the conscience of this court." 237 Kan. at 426.

Plaintiff's injuries are substantial, severe, and permanent. At the age of 28, she was permanently surgically castrated, with all the psychological damage that entails. Her marriage was destroyed. The compensatory damages awarded do not shock the conscience of the court, and are supported by the evidence.

B. Punitive Damages

Robins alleges that the punitive damages awarded were excessive and advances two arguments: first, that the size of the verdict "even viewed in isolation" shocks the conscience, and second, that the trial court erred by excluding "good guy" evidence relevant to punitive damages.

It is difficult, if not impossible, to lay down precise rules of law to determine whether an award of punitive damages is excessive. In *Henderson v. Hassur*, 225 Kan. at 694, we stated:

"The law establishes no fixed ratio between actual and exemplary damages by which to determine excessiveness. In assessing punitive damages the nature, extent, and enormity of the wrong, the intent of the party committing it, and all circumstances attending the transaction involved should be considered. Any mitigating circumstances which may bear upon any of the above factors may be considered to reduce such damages. *Will v. Hughes*, 172 Kan. 45, 55, 238 P.2d 478 (1951). In fixing an award of punitive damages a jury may consider the amount of actual damages recovered, defendant's financial condition and the probable litigation expenses. *Ayers v. Christiansen*, 222 Kan. 225, 229, 564 P.2d 458 (1977)."

Punitive damages may be awarded whenever the elements of fraud, malice, gross negligence, or oppression mingle in the controversy. *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, Syl. ¶ 16. Punitive damages are awarded to punish the wrongdoer for his malicious, vindictive, or willful and wanton invasion of another's rights, with the ultimate purpose being to "restrain and deter others from the commission of like wrongs." 235 Kan. 387, Syl. ¶ 17. "Punitive damages . . . remain as the most effective remedy of consumer protection against defectively designed mass produced articles. They provide a motive for private individuals to enforce rules of law and enable them to recoup the expense of doing so." *Grimshaw v. Ford Motor Co.*,

119 Cal. App. 3d 757, 810, 174 Cal. Rptr. 348 (1981). An award of punitive damages "must be viewed in light of the actual damages sustained, the actual damage award, the circumstances of the case, the evidence presented, the relative positions of the plaintiff and the defendant, and the defendant's financial worth." *Wooderson,* 235 Kan. at 420.

Kansas courts have considered the issue of excessive punitive damages in a number of cases. In *U.S.D. No. 490 v. Celotex Corp.,* 6 Kan. App. 2d 346, 629 P.2d 196 (1981), the Court of Appeals upheld an award of $100,000 compensatory and $600,000 punitive damages against a nationwide seller of roofing systems that had fraudulently concealed defects in its products.

This court, in *Wooderson,* 235 Kan. at 420, upheld punitive damages of $2.75 million, compared with compensatory damages of $2 million, as not excessive. (1.38 to 1 ratio.) A punitive damage award of $1 million was upheld in *Plains Resources, Inc. v. Gable,* 235 Kan. 580, 682 P.2d 653 (1984), where compensatory damages totaled $282,569.05. (3.54 to 1.) See also *Iola State Bank v. Bolan,* 235 Kan. 175, 679 P.2d 720 (1984) (upholding $150,000 punitive damages award compared to $26,663.14 actual damages—5.6 to 1 ratio); *Binyon v. Nesseth,* 231 Kan. 381, 646 P.2d 1043 (1982) (upholding punitive damage award of $100,000 compared to $9,326.06 actual damages—10.7 to 1); *Henderson v. Hassur,* 225 Kan. 678 (upholding punitive damage award of $215,000 compared to $48,000 actual damages—4.48 to 1). In *Sampson v. Hunt,* 233 Kan. 572, 665 P.2d 743 (1983), this court upheld a punitive damage award of $600,000 in a malicious prosecution action where $20,000 actual damages had been awarded. The court stated:

"The award of punitive damages here is 30 times the award of actual damages. The jury verdict shows they found the appellants guilty of maliciously prosecuting these claims against the plaintiff. The jury had before it and was entitled to consider the attending circumstances, the nature of the acts and the intent of the defendants, as well as any mitigating circumstances and Hunt's financial condition. Sampson testified he believed it would take at least a million dollars to stop Hunt's course of litigation against him. The jury obviously believed a large sum was necessary for that purpose. This amount is supported by the evidence. The trial court did not err in refusing to order a remittitur." 233 Kan. at 588.

Robins stresses that no Kansas appellate court has ever upheld a punitive damage award of this magnitude. Neither has any been presented with corporate misconduct of such gravity and duration. We note that, in *Palmer v. A.H. Robins Co., Inc.*, 684 P.2d 187 (Colo. 1984), the Colorado Supreme Court upheld an award of punitive damages of $6.2 million for fraud under a Colorado statute requiring proof of punitive damages to be beyond a reasonable doubt. The *Palmer* award occurred prior to the revelation of Robins' 1975 document destruction program.

In *Wooderson* this court upheld a punitive damage award of $2.75 million as not excessive, having found that there was sufficient evidence for the jury's conclusion that Ortho had been grossly negligent or recklessly indifferent to the rights of others in failing to warn of the dangers of its product. In the present case, the jury made a specific finding of fraud. A review of the record indicates that there was substantial evidence tending to show Robins knew the Dalkon Shield was not safe or effective; that Robins knew of the wicking nature of the tail string; that Robins knew of a high rate of PID and septic abortion associated with the Dalkon Shield; that Robins misled doctors through claims of safety and efficacy while it knew there was no basis for a claim of safety, and all responsible tests for the Dalkon Shield's effectiveness showed a much higher pregnancy rate than Dr. Davis' "1.1%" figure; that Robins similarly misled consumers through a misleading lay promotional campaign; that Robins never publicly retracted its claims of "effectiveness" even though it had privately acknowledged the 1.1% rate as invalid; and that Robins knew there were serious problems with its open-ended nylon multifilament string in maintaining its integrity within the body. But not only was there substantial evidence to conclude that Robins fully comprehended, by 1974 at the latest, the enormity of the dangers it had created, but that it deliberately and intentionally concealed those dangers; that it put money into "favorable" studies; that it tried to neutralize any critics of the Dalkon Shield; that Robins was motivated by a desire to avoid litigation judgments rather than a concern for the safety of the users of the Dalkon Shield; that it consistently denied the dangers of the Dalkon Shield for nearly fifteen years after its original marketing of the Dalkon Shield; that it commis-

sioned studies on the Dalkon Shield which it dropped or concealed when the results were unfavorable; and, ultimately, that it consigned hundreds of documents to the furnace rather than inform women that the Dalkon Shield carried inside their bodies was a bacterial time bomb which could cause septic abortions, PID, and even death.

As to Robins' financial condition, it was established that, in 1970, A.H. Robins Co., Inc., reported net sales of $132.5 million. By 1983, net sales had increased over 400% to $563.5 million. Earnings before taxes in 1983 amounted to more than $91 million and, after tax, net earnings were over $58 million. In 1979, one of Robins' subsidiaries, Miller Morton, received a settlement of $42.5 million in an antitrust suit, which amount was to be paid over a five-year period. Robins' outstanding stock amounted to 25,426,000 shares as of March 1984. The company's stock was being publicly traded on April 1, 1985, for $23.00 per share, indicating the investor-perceived value of Robins to be in the vicinity of $584,798,000.00.

Far from simply being "grossly negligent" in marketing the Dalkon Shield, there was substantial evidence to conclude that Robins deliberately, intentionally, and actively concealed the dangers of the Shield for year after year until those dangers worked their tragic results on Loretta Tetuan. We find that the punitive damages award is not excessive nor does it shock the collective conscience of this court.

Robins suggests that the trial court improperly excluded evidence relevant to punitive damages, specifically, "good guy" evidence showing that Robins had sponsored "orphan drugs" and performed other philanthropic activities. Robins suggests that these were relevant to the issue of its intent.

The evidence was not relevant and was properly excluded. This court announced the standard of relevancy in *Henderson v. Hassur*:

"In assessing the punitive damages the nature, extent, and enormity of the wrong, the intent of the party committing it, and *all circumstances attending the transaction involved* should be considered. Any mitigating circumstances *which bear upon any of the above factors* may be considered to reduce such damages." (Emphasis added.) 225 Kan. at 694.

A person who is ordinarily a philanthropist and humanitarian

does not receive thereby a license to commit intentional wrongs on his days off. Robins was perfectly free to introduce evidence relevant to its knowledge of the Dalkon Shield's dangers or its intent in failing to warn of these dangers, and Robins did so. The jury chose not to believe Robins' evidence. Robins' actions in areas of endeavor wholly separate from the Dalkon Shield were not relevant to the course of action which was the subject matter of this case. In *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, 420-21, 681 P.2d 1038 (1984), we upheld exclusion of evidence of the beneficial effects of oral contraceptives as not proper "mitigating circumstances."

Robins argues that the punitive damages award should have been remitted because of the extent of Dalkon Shield litigation it faces. Robins introduced no evidence of this possibility of exposure to other punitive damages claims at trial for, as Robins states in its brief, "obvious reasons."

The defendant's exposure to other punitive damage claims is a relevant circumstance which may be introduced at trial. Restatement (Second) of Torts § 908, Comment *e* (1977). Robins recognized this potential defense at trial, but chose not to utilize it. In *U.S.D. No. 490 v. Celotex Corp.*, 6 Kan. App. 2d 346, defendant Celotex argued that its potential liability for punitive damages in similar cases should be considered in reducing the present punitive damages award:

"As USD 490 points out in its brief, Celotex had available numerous witnesses who for the purpose of mitigating the punitive damages here might have testified about the cases going on across the country with similar claims of punitive damages. Celotex, however, for tactical reasons, chose not to present such evidence to the jury." 6 Kan. App. 2d at 355.

As in *Celotex*, the defendant here made a calculated tactical decision to attempt to avoid *any* liability, rather than trying to mitigate its punitive damages. Robins made a similar argument before the Colorado Supreme Court in *Palmer*, but again did not present any evidence at trial on the likelihood of other punitive damages. We concur with the Colorado Supreme Court, which rejected the argument as speculative. 684 P.2d at 215-16.

Robins next argues that additional awards of punitive damages are contrary to the public interest. Robins relies upon Judge Friendly's dicta in *Roginsky v. Richardson-Merrell, Inc.*, 378

F.2d 832 (2d Cir. 1967). In *Roginsky*, the Second Circuit reversed a $100,000 punitive damages award, holding that the evidence was insufficient to justify the award. In acknowledged dicta, Judge Friendly stated his concerns regarding punitive damages in products liability situations:

"The legal difficulties engendered by claims for punitive damages on the part of hundreds of plaintiffs are staggering. If all recovered punitive damages in the amount here awarded these would run into tens of millions, as contrasted with the maximum criminal penalty of 'imprisonment for not more than three years, or a fine of not more that $10,000, or both such imprisonment and fine', 21 U.S.C. § 333(b), for each violation of the Food, Drug and Cosmetic Act with intent to defraud or mislead. We have the gravest difficulty in perceiving how claims for punitive damages in such a multiplicity of actions throughout the nation can be so administered as to avoid overkill." 378 F.2d at 839.

In *Celotex*, the defendant made substantially the same argument Robins now makes. The Court of Appeals stated:

"While *Roginsky* certainly provides some support for Celotex's position, it is by no means dispositive of the issue. Alternative solutions exist that allow punitive damages to be awarded in a products liability situation without running into the problems that were anticipated in *Roginsky*. See Owen, *Punitive Damages in Products Liability Litigation*, 74 Mich. L. Rev. 1258 (1976)." 6 Kan. App. 2d at 355.

However, as the Court of Appeals found, Celotex had precluded the ability of the trial court to consider other punitive damage litigation by its tactical decision to exclude all references to other such litigation. The Colorado Supreme Court, in *Palmer*, rejected Robins' argument:

"Robins' due process arguments are several. It initially asserts that the potential for multiple punitive awards involving the same product clashes with the concept of fundamental fairness. If this argument were followed to its logical conclusion, however, it would mean that 'punitive damages could never be assessed against a manufacturer of a mass produced article.' *Grimshaw v. Ford Motor Co.*, 119 Cal. App. 3d 757, 812, 174 Cal. Rptr. 348, 383 (1981). The need for punitive damages is just as real as the danger of multiple awards. *Wangen v. Ford Motor Co.*, 97 Wis. 2d 260, 294 N.W.2d 437 (1980); Owen, *Punitive Damages in Products Liability Litigation*, 74 Mich. L. Rev. 1257, 1325 (1976)." 684 P.2d at 215.

The *Palmer* court also noted that the dangers of excessive punitive awards could be avoided:

"While the propriety of punitive damages must be decided on a case-by-case basis, there are safeguards available to a trial court faced with a defendant's claim

that, due to past punitive awards arising out of the same course of conduct, it will face economic disaster from a substantial punitive damages verdict in the case at issue. When an adequate showing is made by the defendant, the court might consider granting a bifurcated trial on the issue of punitive damages in order to avoid any prejudice to the defendant on the issue of liability. [Citation omitted.] The jury under such circumstances could consider at the second phase of the trial the amount of any unsatisfied or satisfied past punitive awards as well as the past and present financial condition of the defendant. Another safeguard, closely related to a bifurcated proceeding, is to instruct the jury, when so requested by the defendant, that it may properly consider the amount of past punitive verdicts imposed on the defendant as a result of its marketing conduct. [Citation omitted.] Finally, close judicial scrutiny of a punitive damages verdict, against the back-drop of the particular circumstances of the case, is another means of assuring that the award is proportionate to the defendant's wrongdoing, is commensurate with the defendant's financial ability to pay, and actually serves the purposes of punishment and deterrence. [Citations omitted.]" 684 P.2d at 215-16.

However, Robins' failure to provide at trial any evidence on its probable punitive liability exposure frustrated any of these mechanisms.

This court discussed the issue in *McDermott v. Kansas Public Service Co.*, 238 Kan. 462, 712 P.2d 1199 (1986), stating:

"The *Roginsky* court was concerned that an award of punitive damages in a large number of those cases would be staggering. The *Roginsky* court disallowed the award of punitive damages, however, not because of the multiplicity of punitive claims but because the evidence presented on trial was not sufficient to allow the issue to go to the jury. In a later Oregon case, *State ex rel. Young v. Crookham*, 290 Or. 61, 618 P.2d 1268 (1980), the court discussed *Roginsky* and said:

" 'Hindsight demonstrates that the apprehension of the *Roginsky* court was heavily exaggerated. Of the 1,500 cases, in only 3 did juries award punitive damages. The vast majority of cases were settled and the financial destruction feared by the Second Circuit did not come to pass.' 290 Or. at 66.

"In *State ex rel. Young v. Crookham*, the Oregon Supreme Court faced the issue of whether Oregon should adopt the 'one bite' or 'first comer' theory, so that the award of punitive damages to the first plaintiff would preclude the recovery of punitive damages for all subsequent plaintiffs. In a lucid and well-reasoned opinion, Oregon rejected the 'one bite' theory, concluding that such a rule would threaten to reduce civil justice to a race to the courthouse steps, would provide a windfall to the first plaintiff, and would not be fair. The court points out possible alternatives such as class actions, remittitur, total elimination of punitive dam-ages in mass litigation, and jury consideration of earlier and possible future punitive awards in each case. We have found no case holding that a plaintiff is prohibited from recovering punitive damages from a defendant merely because a previous plaintiff has recovered punitive damages from the same defendant based on the same conduct." 238 Kan. at 465.

While we have been cited to no cases that have adopted Judge

Friendly's *Roginsky* dicta, several courts have considered and rejected it. In *Moran v. Johns-Manville Sales Corp.*, 691 F.2d 811 (6th Cir. 1982), the Sixth Circuit expressly rejected Judge Friendly's views:

"We are not dissuaded from allowing punitive damages because this cost will ultimately be borne by 'innocent' shareholders. Punitive damage awards are a risk that accompanies investment. . . . Investors may typically place their money where they choose and withdraw it when they wish. The prospect of ultimate liability for punitive damages may encourage investors to entrust their capital to the most responsible concerns." 691 F.2d at 817.

The court found the defendant's requests for protection from punitive damages were more properly addressed to the state legislatures or Congress than to the courts.

In *Froud v. Celotex Corporation*, 107 Ill. App. 3d 654, 658, 437 N.E.2d 910 (1982), the court stated:

"We note, however, that defendants' brief contains a broad-based attack on the propriety of punitive damage awards in the context of mass tort litigation, such as the large number of asbestos cases which have been filed across the nation. It is feared that, in such mass tort cases, the possibility that each plaintiff could separately recover a substantial award of punitive damages might bankrupt even the richest defendants. The defendants therefore argue that public policy should prohibit punitive damages in mass tort cases. But we do not believe that defendants should be relieved of liability for punitive damages merely because, through outrageous misconduct, they may have managed to seriously injure a large number of persons. Such a rule would encourage wrongdoers to continue their misconduct because, if they kept it up long enough to injure a large number of people, they could escape *all* liability for punitive damages."

In *Neal v. Carey Canadian Mines, Ltd.*, 548 F. Supp. 357, 376-77 (E.D. Pa. 1982), the court also rejected a manufacturer's argument based upon the concerns expressed in the *Roginsky* dicta:

"Moreover, there is no legal or equitable basis to allow punitive damage awards to the first plaintiffs in multiple product liability litigation but then to deny such a right to recovery to future plaintiffs. Each tort committed by the defendant is individual and peculiar to that particular plaintiff who has brought suit. Punitive damages are a recoverable item of relief so long as the conduct exhibited by the defendant with respect to that individual plaintiff can be termed as 'outrageous' and a reckless indifference to the rights of that plaintiff."

Before considering whether the concerns expressed in *Roginsky* should be available to Robins as a defense, we must determine whether Robins has provided this court with ade-

quate proof that the punitive damages it faces are, in fact, likely to destroy the company.

The affidavits provided to the trial court by Robins indicated that Robins has incurred eleven punitive damage awards in its fifteen years' experience with the Dalkon Shield prior to the filing of its Chapter 11 bankruptcy petition. The largest award is the present award of $7,500,000.00. The smallest punitive damage award was a 1985 judgment for $5.00. Not including the present award, Robins has incurred punitive damage judgments of $17,327,005.00. Robins has paid only $11 million in satisfaction, however, and plaintiff strongly argues that much of this figure represents interest on unsatisfied judgments.

The figures Robins provides in its affidavits are woefully inadequate to determine Robins' true potential for future punitive damage exposure. *If the figures are correct*, 12,512 Dalkon Shield cases have arisen, of which 7,727 (or 61%) have been settled (7,704) or have had judgment for the plaintiff (23). 4,785 claims remain outstanding. *Robins provides no information on the likelihood of future claims. Robins provides no information on previous claims which it successfully defended.* It is impossible on this limited basis to determine the total outstanding liability exposure of Robins.

Robins' affidavits state the company has paid out a total of $368 million in Dalkon Shield claims. Of this amount, $357 million appears to have been for compensatory damages. How much of this amount was covered by Robins' liability insurance is not stated.

Is Robins insolvent? The information before this court does not give a satisfactory answer. It is important to note that the Chapter 11 petition Robins has filed is a *voluntary* action and contains *no insolvency requirement. In re Johns-Manville Corp.*, 36 Bankr. 727, 732 (Bankr. S.D.N.Y. 1984). Indeed, there is serious doubt whether Robins is in the imminent financial peril it now claims. A recent analysis (Note, *Strategic Bankruptcies: Class Actions, Classification & the Dalkon Shield Cases*, 7 Cardozo L. Rev., 817, 827 [1986]), concludes that Robins' main motivation in filing the Chapter 11 petition was to create a "de facto" class action by forcing claimants to proceed through the Eastern District of Virginia Bankruptcy Court and indicates the filing was essentially a response to the federal court decision to

decertify a nationwide class action on punitive damages. *In re Northern Dist. of Cal., Dalkon Shield, Etc.*, 693 F.2d 847 (9th Cir. 1982); *In re Dalkon Shield Punitive Damages Litigation*, 613 F. Supp. 1112 (E.D. Va. 1985).

The trial court indicated that Robins' net sales have increased from $132.5 million in 1970 to $386.4 million in 1979, and to $563.5 million in 1983. Robins' net worth was $79 million in 1970; in 1983, it was $355 million. There is no evidence in the record as to Robins' financial status after 1983. The record indicates only that, until 1983—despite the Dalkon Shield litigation—Robins experienced phenomenal growth. Of course, while the case remains under the jurisdiction of the bankruptcy court, Robins' management continues to operate the corporation, and further proceedings against Robins have been stayed. 11 U.S.C. § 1108 (Supp. III, 1985).

A review of the relatively meager information Robins has put before the court indicates that, of all the claims it has paid on the Dalkon Shield, the overwhelming amount, some $357 million, or 97%, has been for compensatory damages. Robins has paid some $11 million (3%) for punitive damages. If Robins does, in fact, become insolvent due to Dalkon Shield litigation, it would not be because of punitive damage awards, but because of the overwhelming amount of compensatory claims. The question remains whether Judge Friendly's *Roginsky* dicta should protect Robins in this case. We find it should not.

The concerns expressed in *Roginsky* of multiple punitive damage awards in mass accident or products liability cases may require consideration by this court at some future time. But this is not the "ordinary" products liability case. It is not based upon negligence (gross or ordinary), it is not based upon strict liability, and it is not based upon a breach of warranty—although many elements of those may also be present here. It is based upon the defendant's deliberate and active fraudulent concealment of the dangers of its product. It is not based upon a "single management sin" such as producing a defective product or negligently designing a product but, rather, it arose out of a continuous corporate policy of misrepresentation and concealment for more than a decade. There may be a case when granting a product

manufacturer relief from punitive damages may be wholly appropriate. It is not appropriate in the present case.

Robins advances a number of other arguments against the punitive damages award. It argues that plaintiff's request in closing argument that the jury give a "final judgment" against Robins was an effort by which "the jury was asked to return a verdict which was to provide complete punishment against Robins for all problems claimed to be related to the Dalkon Shield." Robins also stresses that it only netted "approximately $500,000" from the Dalkon Shield. Robins' final general argument is that the punitive damages award cannot "be justified as necessary to deter Robins from action in the future because it stopped selling the Dalkon Shield more than 10 years before the Tetuan trial."

The first argument is simply not persuasive. A plain reading of the record does not indicate that plaintiff's counsel did anything more than request the jury to return punitive damages against Robins in its "final judgment." The record does not indicate counsel requested the jury to give "complete punishment" of Robins for all its misdeeds.

Robins' second argument has a questionable factual basis. Plaintiff contends that the $500,000.00 figure was developed solely for litigation purposes and asks how Robins, which sold 4.4 million Dalkon Shields in the United States and abroad, costing $.30 per unit to produce and selling for $4.35, could net only $500,000.00. In any case, *how much Robins managed to profit by its fraud* is not the ceiling of its punitive damage liability. Indeed, if such were the case, punitive damages would have no deterrent effect because the wrongdoers would be compelled to relinquish only their ill-gotten gains and no more. Robins' profits on the Dalkon Shield are relevant, but only to the extent that they affected the net wealth of the company.

Finally, Robins' suggestion that, since it removed the Dalkon Shield from the marketplace in 1974, it should not be subject to punitive damages awards ten years later is truly remarkable. While Robins stopped selling the Dalkon Shield in 1974, it did so only under pressure from the FDA; it continued to sell its remaining stock of Dalkon Shields overseas after 1974. Most importantly, of course, the punitive damages were awarded in this case not solely because Robins had sold Dalkon Shields, but

that, even after doing so, it fraudulently concealed the Shield's defects for years.

Robins' final argument is that the punitive damages award unconstitutionally punishes Robins, and that the present award will not achieve its purpose of deterrence. Robins relies upon Judge Heaney's dissent in *In re Federal Skywalk Cases*, 680 F.2d 1175, 1188 (8th Cir.), *cert. denied* 459 U.S. 988 (1982) (Heaney, J., dissenting):

"Unlimited multiple punishment for the same act determined in a succession of individual lawsuits and bearing no relation to the defendants' culpability or the actual injuries suffered by victims, would violate the sense of 'fundamental fairness' that is essential to constitutional due process."

We would point out that Robins is not being punished for a "single act." It is not being punished for a single instance of negligence or recklessness in designing a skywalk. It is being punished for a series of corporate actions which for more than a decade involved fraudulent misrepresentations and fraudulent concealment.

A similar argument was presented to the Kansas Court of Appeals in *U.S.D. No. 490 v. Celotex Corp.*, 6 Kan. App. 2d 346, 629 P.2d 196 (1981). The court stated:

"Celotex presents the novel argument that the imposition of punitive damages against Celotex, an interstate mass-marketer, violates its constitutional guarantee of due process, its right to protection against double jeopardy, and subjects it to cruel and unusual punishment. The imposition of punitive damage awards, although penal in nature, does not approach the severity of criminal sanctions and does not demand the same safeguards as do criminal prosecutions. See Comment, *Criminal Safeguards and the Punitive Damages Defendant*, 34 Univ. Chicago L. Rev. 408 (1967).

"In arguing that successive punitive damage verdicts subject it to cruel and unusual punishment, Celotex relies upon the suggestion in a concurring opinion by United States Supreme Court Justice Frankfurter that the Eighth Amendment could protect against multiple civil penalties. See *U.S. ex rel. Marcus v. Hess*, 317 U.S. 537, 556, 87 L. Ed. 443, 63 S. Ct. 379 (1943). The United States Supreme Court, however, has recently ruled that the Eighth Amendment is generally limited to challenging conditions of a criminal sentence. See *Ingraham v. Wright*, 430 U.S. 651, 51 L. Ed. 2d 711, 97 S. Ct. 1401 (1977). In our opinion, the Eighth Amendment does not apply to the facts before us." 6 Kan. App. 2d at 355-56.

This court rejected a similar claim in *McDermott v. Kansas Public Serv. Co.*, 238 Kan. at 467. See *Palmer v. A.H. Robins Co., Inc.*, 684 P.2d 187, 214-17 (Colo. 1984).

Robins' final point is: "Maximum deterrence was achieved long ago," and cites Judge Kelly's decision in *O'Gilvie v. Intern. Playtex, Inc.*, 609 F. Supp. 817, 819 (D. Kan. 1985). Robins' argument, of course, entirely fails to address the fact that the purpose of punitive damages in Kansas is not merely to deter *the defendant* from future misconduct, but "to restrain and deter others from the commission of like wrongs." *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, Syl. ¶ 17, 681 P.2d 1038 (1984). In *O'Gilvie*, in order to obtain a remittitur of a $10 million punitive damages award to $1.35 million, the defendant immediately recalled its product and began a public education campaign about its product's dangers. Robins' historical reaction to punitive damage awards has proven to be less than commendable.

The $6.2 million punitive damage award against Robins in *Palmer* was rendered by the jury on July 30, 1979. Loretta Tetuan first experienced symptoms of PID in late September of that year. It is entirely possible that plaintiff's injuries could have been avoided if the company had reacted to the verdict by immediately moving to recall the product or to at least warn of its dangers. Instead, Robins responded with the same position it had taken for the last decade—that the Dalkon Shield was "safe and effective." Robins issued a statement on July 31, 1979, that the verdict was "an aberration" and that it was confident "this unwarranted verdict will not survive" on appeal.

The first Dalkon Shield case to proceed to trial on the merits occurred in Kansas in *Deemer v. A.H. Robins Co.*, Case No. C-26420. On March 1, 1975, the jury awarded punitive damages against Robins in the amount of $75,000. Robins did not recall the product; it did not warn users of the Dalkon Shield's dangers; it did not warn physicians. It certainly did not warn Loretta Tetuan or the physicians who treated her. Instead, it reacted to the modest punitive damages award in *Deemer* by promptly attempting to destroy all evidence of its knowledge of the Dalkon Shield's dangers, consigning hundreds of documents to the draft furnace. To punish Robins for its conduct and to discourage others from committing like wrongs in the future, the punitive damages award is justified.

The judgment is affirmed.